[Civ. No. 2324.   Second Appellate District.—December 7, 1917.]

In the Matter of the Application of FREDERIC M. SHEPARD for Reinstatement as a Member of the Bar of the State of California.

ATTORNEY AT LAW—DISBARMENT—SMUGGLING OF OPIUM INTO UNITED STATES—ACT INVOLVING MORAL TURPITUDE.—Under subdivision 1 of section 287 of the Code of Civil Procedure, providing for the disbarment of an attorney at law upon his conviction of a felony or misdemeanor involving moral turpitude, an attorney convicted of the crime of conspiring to smuggle opium into the United States in violation of the act of Congress of January 17, 1914, is subject to disbarment.

ID.—DISBARMENT FOR FELONY INVOLVING MORAL TURPITUDE—NOTICE OF PROCEEDING NOT REQUIRED.—In a proceeding for the disbarment of an attorney at law under subdivision 1 of section 287 of the Code of Civil Procedure, no notice is required to be given to the attorney, since it is provided by such section that the record of conviction shall be conclusive of his conviction of a felony or misdemeanor involving moral turpitude.

ID.—CONVICTION IN FEDERAL COURT—DISBARMENT.—Under subdivision 1 of section 287 of the Code of Civil Procedure, an attorney at law may be disbarred for an offense against the federal laws for which he was convicted in the federal courts, notwithstanding the provision of section 288 of such code, which requires the clerk of the court in which the conviction was had to transmit the record to the supreme court, since said subdivision 1 makes records of conviction conclusive evidence regardless of their place of origin.

ID.—REINSTATEMENT TO PRACTICE — PREMATURE APPLICATION.—An attorney convicted of conspiracy to smuggle opium into the United States in violation of federal law is not entitled to reinstatement for good moral character within a little over three years after the commission of the crime, two and one-half years after sentence, one year after his conviction became final, seven months after his disbarment, six months after he began his imprisonment, and three months after he concluded it.

ID.—PURPOSE OF DISBARMENT.—Disbarment of an attorney for an offense involving moral turpitude is not punitive in character, but protective of the public and the legal profession.

APPLICATION originally made to the District Court of Appeal for the Second Appellate District for reinstatement to practice law.

The facts are stated in the opinion of the court.

D. M. Hammack, for Petitioner.

Frank C. Collier, for Los Angeles Bar Association, Respondent.

WORKS, J., *pro tem.*—In July, 1914, petitioner and one A. C. Brown committed the crime of conspiracy to import into the United States from Mexico eighty cans of smoking opium, and to receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such opium, in violation of the act of Congress of January 17, 1914. Shepard and Brown were indicted for the offense by the federal grand jury, were tried, and were convicted. By judgment and sentence entered April 28, 1915, they were each condemned, by the district court of the United States in and for the southern district of California, to imprisonment for a year and a day in the state penitentiary at San Quentin. Shepard sued out a writ of error to the United States circuit court, ninth circuit, but his conviction was affirmed by that tribunal on October 4, 1916. He then sought a pardon at the hands of the national executive, but it was refused; although the President, after granting Shepard a respite expiring April 11, 1917, did commute the sentence to imprisonment in the jail of Los Angeles County for ninety days. Shepard entered upon the service of the sentence at the conclusion of the respite and was discharged July 9, 1917. Meanwhile, on March 5, 1917, a certified copy of the record of conviction was presented to this court in open session and Shepard was, on that day and without notice to him, disbarred. His admission to the bar of California was on December 6, 1909. This proceeding was instituted October 15, 1917.

The disbarment was ordered under the provisions of subdivision 1 of section 287 of the Code of Civil Procedure, to the effect that an attorney and counselor may be removed or suspended upon his "conviction of a felony or misdemeanor involving moral turpitude." It is contended that the disbarment was unjustified, for the reason that the crime of which Shepard was convicted does not involve moral turpitude and that, therefore, his reinstatement should follow. We shall make no attempt to define the term upon which this question

hinges, leaving it to be understood that the phrase itself has, without the aid of specific definition, a sufficiently clear meaning to enable us to determine whether the offense of Shepard comes within it. Counsel for the Bar Association characterizes a smuggler as one who makes endeavor to defraud the government out of the revenue derivable from the entry into the country of dutiable goods, and contends that the commission of such a fraud, or the formation of a conspiracy to commit it, is immoral and wrong to the extent that it necessarily involves moral turpitude. Counsel for the petitioner responds that smoking opium is nót a dutiable article, and that it is denied admission to the United States, duty or no duty (and so it is), as if that fact lessens or wipes out any immorality which may fasten to the smuggler of dutiable articles. This question we will discuss later, as we now deal with the question of smuggling in general, as respects the matter of its turpitude or the lack of it. We anticipate our later discussion, however, to the extent of remarking that we shall now assume that the smuggling of opium into the country for smoking purposes is on at least as low a moral plane as the smuggling of dutiable articles with intent to defraud the government out of the revenue which would otherwise arise from importation. Returning to the question as to how we shall regard the smuggler, we may appeal to the popular feeling on the subject, for whether any act involves moral turpitude may with a great degree of safety be left to the estimation of a healthy-minded public concerning the act, unless, indeed, there be something like an equal division of opinion on the subject. Can there be any doubt as to the manner in which the smuggler is regarded by a vast majority of the public? It is not in fiction alone that smuggling is classed with piracy, for in the public mind the two are more or less closely associated. Certainly, we may say with confidence that in the popular estimation, and in truth, smuggling is a highly immoral crime against society and government. There is, of course, no difference, favorable to the petitioner, at least, between one guilty of smuggling and one guilty of conspiracy to smuggle.

How, now, is the smuggling of smoking opium to be regarded? The effects of the opium habit on the human system are generally understood, certainly in their salient features, but let us attend to a graphic description of the thraldom

under which the victim of the habit rests.  We quote from the Americana, title "Opium":

"Indispensable as opium is in certain affections, in the hands of the thoughtless and weak it is too often a curse.  It is the most seductive of all the narcotics.  'By its soothing and exhilarating influences it gains such a hold on the moral and physical nature that the strongest will is unable to emancipate the victim from its enchantment, and moral degradation results.' . . . Victims of the opium habit frequently become so demoralized as to need care in an asylum.  They lie, steal, lose self-respect and ambition, are forgetful, may be subject to delusion, fear, and superstition, and are careless as to clothing and necessary habits, while still thinking highly of themselves.  The great nerve-centers tolerate stimulation to a certain point.  When the limit is reached, the time varying in different persons, the action of the various organs and tracts is disordered.  The victim of opium suffers from imperfect digestion, faulty appetite and assimilation, and consequent malnutrition. . . . Primarily there is functional derangement of the brain, then permanent deterioration.  He becomes a slave to his depraved appetite.  When the time draws near for his allotted dose he is nervous, yawns, may have neuralgia, is weak, breaks out into a perspiration, and is miserable.  He takes his dose, and is himself again; but after a time the dose has to be increased, and if relief from his craving is not obtained, he sinks lower and lower and dies a wretched death."

What would be the popular opinion concerning Shepard if it became generally known that he had delivered opium to innocents whose lives, through his acts, might become such as are here depicted?  And yet, in the commission of the crime of which he stands convicted he evinced the possession of the will, and even of the intent, in effect, to do that very thing, for the result of the carrying out of such a conspiracy as that in which he engaged would make it possible for others directly to make distribution of the poison.  Truly, it seems a travesty to insist that acts such as these are to be differentiated, in a way favorable to the petitioner, from the mere maiming and stabbing of the body with deliberately formed purpose and intent to wreak harm and injury upon it.  We conclude that among the elements of Shepard's crime was a high degree of moral turpitude.

It is insisted that this court had no jurisdiction to remove Shepard's name from the roll of attorneys without notice. Section 287 of the Code of Civil Procedure provides that where an attorney is sought to be removed for conviction of a felony or misdemeanor involving moral turpitude, "the record of conviction shall be conclusive evidence" upon the question before the court. This provision is contained in the first subdivision of the section, the other subdivisions referring to removals or suspensions for other causes. Section 289 provides that "The proceedings to remove or suspend an attorney and counselor, under the first subdivision of section 287, must be taken by the court on the receipt of a certified copy of the record of conviction." It is also, to the effect that proceedings under some of the other subdivisions, naming them, "may be taken by the court for the matters within its knowledge, or may be taken upon the information of another." Section 290 provides: "If the proceedings are upon the information of another, the accusation must be in writing." Section 292 is, in part: "Upon receiving the accusation, the court shall make an order requiring the accused to appear and answer it at a specified time, and shall cause a copy of the order and of the accusation to be served upon the accused at least five days before the day appointed in the order."

Under these sections proceedings for removal or suspension are divided into two classes. The first of these includes, alone, proceedings based upon convictions of felonies or misdemeanors, involving moral turpitude. The second class includes two subclasses, first, those proceedings to be taken for matters within the knowledge of the court, and, second, those which may be taken upon the information of another. Certainly, it appears to us, whether notice is required in proceedings under both subclasses of the second class or whether it is not, it is clear that no notice is required in proceedings of the first class. The provision as to proceedings of that class, to the effect that the record of conviction shall be conclusive evidence, is strongly persuasive of the question, alone; and when we look to section 292, which provides with particularity for notice in certain cases, all doubt vanishes. That section does not require notice in a case such as we now have before us. In every case, under section 292, a copy of the accusation must be served on the accused, and there can be

no copy of an accusation not in writing. There is nothing in any of the sections which calls for a written accusation where an attorney is sought to be removel for conviction of a felony or misdemeanor involving moral turpitude; and neither written accusation nor notice would seem to be necessary, looking at the question in the abstract, because of the proviso that the record of conviction is conclusive evidence in such cases. In a proceeding of that class there is but one question to be determined by the court: Was moral turpitude involved in the crime as to which the conviction resulted? That is purely a legal question, one which the legislature evidently determined to leave to the courts without the aid of argument and one which it might very properly, so far as we can perceive, leave to be settled in that manner.

There is another reason why the objection that petitioner had no notice of his impending disbarment is without weight here. He concedes that the only point as to which notice would have availed him anything, or as to which he could have been heard, was the question whether the crime he committed involves moral turpitude. He has now had a hearing upon that question and we have resolved it against him. Therefore, our determination, arrived at when the order for disbarment was made, was correct. It would be idle now to set that action aside, even if our view upon the question of the necessity for notice were different from that which we have above set forth. This proceeding, to the extent that it is an assault upon the validity of the order for disbarment, calls for a review of that order, it is true; but it is not a review of, or an appeal from, an order of a lower tribunal, for technical error in the making of which a reversal will result. We are passing upon an order of our own, and our only duty, so far as this branch of the present proceeding is concerned, is to determine whether that order was right in substance.

The next objection made to the validity of the disbarment order is that petitioner could not have been removed legally upon a conviction in the United States court. To state it more broadly, the position of petitioner is that a removal or suspension under subdivision 1 of section 287 of the code can only result where the conviction mentioned in the subdivision arises from a prosecution in a California court. This contention is based upon the language of section 288, which is as follows: "In case of the conviction of an attorney or counselor

35 Cal. App.—32

of a felony or misdemeanor, involving moral turpitude, the clerk of the court in which such conviction is had shall, within thirty days thereafter, transmit to the supreme court a certified copy of the record of conviction.'' It is asserted that the record mentioned in this section is the only record which can be used in a proceeding under subdivision 1 of section 287; and in stating his argument on the point, counsel for petitioner says that the California legislature has no power to order a record of conviction to be sent to the supreme court except from a California court. This latter statement is perfectly sound, and its truth is a conclusive reason for the legislature not having attempted to order records of conviction from federal courts or from the courts of other states. But the fact that the legislature could not compel the production of such records from other jurisdictions has no bearing upon the right, the power, the duty, of the law-making body to authorize the courts to consider outside records of conviction if produced in any other way than through obedience to legislative enactment. Subdivision 1 of section 287 is general in its terms and that would seem to be sufficient. It makes ''records of conviction,'' without limitation as to the place of their origin, conclusive evidence of the question before the court, and it provides for disbarment or suspension for conviction of a felony or misdemeanor involving moral turpitude in the most general terms and without any limitation whatever as to the jurisdiction in which the conviction is secured. Not only is the section apparently all-inclusive in the respects mentioned, but there is convincing reason behind its existence in that form. A crime committed by a California lawyer in Nevada or Massachusetts is just as bad, involves as high a degree of moral turpitude, affects as greatly the desirability of his retention in the legal profession, as if the same crime were committed in California. Imaginary lines on the surface of the globe do not affect the character of acts done to the north or south or to the east or west of them. We have not considered the question whether subdivision 1 of section 287 would be unconstitutional if we were forced to construe it as petitioner insists we should, for such a labor is unnecessary and the question is not argued; but there is something essentially unequal, unfair, and unjust in the idea that a California lawyer committing a crime within the state may be put beyond the pale of the profession by summary pro-

ceeding, while one of his brethren committing the same or a worse crime immediately beyond the Nevada border or on a vessel at sea immediately outside the three-mile limit, on the California coast, may not be removed in like manner. These considerations throw light upon the intention of the legislature, although its intention, indeed, seems to be shown plainly by the very language of subdivision 1. By the adoption of section 288 the legislature evinced its purpose to aid in the enforcement of subdivision 1 of section 287 to the extent that its authority permitted, leaving the production of records of conviction from other jurisdictions to be procured in some other manner. In announcing this position we are not overlooking the fact that section 288 has been slightly changed in phraseology since its original adoption in 1872. There has been no alteration in the section which aids the question of construction here presented.

We have now made disposition of all questions involving the validity of the order of disbarment. There is but one other point left to us. Petitioner asks for a reinstatement in the profession because of his good moral character, and affidavits and petitions from lawyers and judges are presented in that behalf. It will be noted that the petition was filed a little over three years after the commission of Shepard's crime, two years and a half after his sentence, one year after his conviction became final by decision of the United States circuit court of appeals, seven months after his disbarment, six months after he began his imprisonment, and three months after he concluded it. The affidavits presented in support of the application for reinstatement cover generally, in the main, his conduct since the commission of the crime. There is in them no particular attempt to make a segregation of the question as between times before and times since his disbarment.

In considering this question it may be well to state more fully the nature of Shepard's offense, as the facts naturally do not appear upon the record of conviction. We quote from the opinion of the United States circuit court of appeals, rendered in disposing of his writ of error to that tribunal (*Shepard* v. *United States,* 236 Fed. 73, 75, [149 C. C. A. 283, 285]):

"In July, 1914, plaintiff in error was retained as attorney at law to represent and to obtain bail for certain persons who

were lodged in the county jail in Los Angeles, charged with the crime of conspiracy to import opium into the United States from Mexico in violation of the laws of the United States. One A. C. Brown was also employed by the same persons for the purpose of obtaining such bail. In connection with their efforts to secure bail, and at the instance of their clients, plaintiff in error and Brown proceeded to Tia Juana, just over the boundary line in the republic of Mexico, where they found forty five-tael cans of smoking opium which had been concealed by their clients. This opium Brown proceeded to dispose of in Tia Juana for either $32 or $34 per can, making a total sum of either $1,280 or $1,360, and, after deducting his proportion of the proceeds in accordance with a previous understanding with their clients, Brown delivered the balance of one thousand dollars to plaintiff in error. A second lot of fifty-three or fifty-four cans, concealed in the same vicinity, was searched for, but not found by the plaintiff in error. It appears, however, that a quantity of opium was found in that neighborhood by the defendant Brown and sold. A third lot was found by the plaintiff in error and the defendant Brown, concealed near Jacumba, in Mexico, about seventy-six miles east of San Diego, near the boundary line. The defendant Brown subsequently brought this lot to or near Los Angeles, in California, where it was concealed for a time."

It will be noted from this quotation that the petitioner's offense was committed in connection with opium which his clients had concealed near the Mexican border and that those clients were at the time in jail, charged with the very offense which Shepard also committed in and about their affairs. We cite these circumstances to show the petitioner's familiarity with the nature of his acts and with the danger he incurred in performing them. It is also to be noted that his offense was committed in connection with the practice of his profession, and did not relate to matters distinct from his work as a lawyer. What reputable member of the profession can see himself going from Los Angeles to the Mexican border upon the quest on which Shepard went and doing what he did? Under such circumstances as these, Shepard should not be restored to the right to practice law until he has lived, for some considerable time, a life of exemplary conduct in all that pertains to his relations with his fellowmen. It is too early for

his request for reinstatement to be favorably considered, even assuming that at some time it might be so considered.

· In one or two of the affidavits in the record the statement is made that the petitioner has been punished enough, as if a disbarment were punitive in character. It is not. The removal of an attorney's name from the rolls of the profession is a measure protective in character; in a certain sense protective of the profession, but in a higher sense protective of the public which finds it necessary to resort to the services of lawyers. No one not a lawyer can fully realize the opportunities for undiscovered peculation, graft, and embezzlement which are afforded the practitioner at the Bar. No one not a lawyer can so well understand the degree to which the public is entitled to protection from dishonesty in the profession. When a member of the profession has been found lacking in the requisites which go to make him a helper to his clients and has been discovered to possess aims, views, and purposes which indicate a moral obliquity in him, and which might make his clients his victims, it is well that·he were removed from the possibility of doing them harm. When he has been once disbarred, a mistaken charity should not restore him to his position. That restoration should only come when he has lived long enough after his disbarment in honorable intercourse with his fellow-citizens to demonstrate that he is both tried and true.

The petitioner's application for a reinstatement is denied.

Conrey, P. J., and James, J., concurred.