[L. A. No: 19568. In Bank. Aug. 27, 1946.]

LELAND McARTHUR, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Philbrick McCoy for Petitioner.

T. Paul Moody and Jerold E. Weil for Respondent.

THE COURT.—Petitioner seeks reinstatement as an attorney at law. The Board of Governors of The State Bar, by unanimous vote of the 13 members present and voting, declined to recommend reinstatement. After consideration of the entire record we have concluded, for the reasons hereinafter stated, that petitioner has failed to establish that he has attained such degree of rehabilitation as would justify us in reinstating him.

Petitioner was admitted to the practice of law in Illinois in 1916 and in California in 1920, and on June 12, 1933, upon recommendation of the Board of Governors he was disbarred by order of this court. He sought no review of the board's recommendation in that proceeding. Petitioner had, however, previously (on June 22, 1932) been suspended from the practice of law for 18 months upon order of this court made after a review of the proceedings leading to a recommendation by the Board of Governors that such suspension be imposed. (*McArthur* v. *State Bar,* 215 Cal. 652 [12 P.2d 453].) In addition, on December 21, 1932, while the proceedings which resulted in petitioner's disbarment were pending, he pleaded guilty to two counts of an information filed against him in

the superior court in Los Angeles; one of the counts charged him with issuing a check without sufficient funds, and the other with grand theft. On the same day he was sentenced to San Quentin Penitentiary, the sentence was suspended, and he was placed on probation for a total period of 20 years upon certain terms and conditions and was thereupon released. Neither suspension nor disbarment followed as a result of these criminal proceedings.

The ground for the disbarment of petitioner was that he commingled certain funds of the estate of Mildred Ritchie, a minor, with funds of his own; it appears that the estate was reimbursed before the disciplinary proceedings were instituted. The grounds for suspending petitioner for 18 months are fully set forth in our opinion in that proceeding (*McArthur* v. *State Bar, supra,* 215 Cal. 652) and it is sufficient to state here that the suspension resulted from charges that petitioner unlawfully took from one Cora Dodd Tippie the sum of $3,000. This sum also was repaid by the end of June, 1933.

As to the two counts of the criminal information to which petitioner pleaded guilty, he states in his petition to this court to review the reinstatement proceedings, that "The record . . . shows that petitioner pleaded guilty to a charge of grand theft of some $9,000 and the issuance of a bad check for $1,000." The record discloses further that the two offenses were committed in February and March of 1931 when petitioner was the attorney for Madge Morrison, administratrix of the estate of Mary Fitzgerald, deceased, and involved funds handled by petitioner for the estate. On November 2, 1933, Madge Morrison as such administratrix secured a judgment against petitioner in the sum of $9,601.10, together with interest and costs, following findings by the court that petitioner had appropriated to his own use that sum of estate money in addition to other funds belonging to the estate and that he had repaid no part of the $9,601 which represented the principal of the judgment. The findings and judgment state further that as collateral security for repayment of the misappropriated sums petitioner had delivered to the then attorney for the Fitzgerald estate eight described "evidences of indebtedness, securities, and/or choses in action." One of the terms of the probation granted petitioner following his sentence to San Quentin was that he make restitution of the sum of $9,601 to Madge Morrison, administratrix of the Fitz-

gerald estate. On December 21, 1942, petitioner received from the governor of this state a pardon which stated, among other things, that "I am informed that the applicant has made restitution by repaying the sums of money misappropriated. He has delivered to this office, for transfer to the aggrieved parties, a promissory note as final payment." On September 3, 1943, petitioner filed with The State Bar his petition for reinstatement.

Following eight hearings held during the period of November 29, 1943, through April 23, 1945, before a special administrative committee of The State Bar, instructed by the Board of Bar Governors, "to investigate and hear evidence and make findings of fact based thereon," that committee found, and reported to the board, on August 10, 1945, that "(1) The petitioner is not sufficiently rehabilitated to warrant his reinstatement; (2) The petitioner has not the high moral qualifications required of a member of the Bar; (3) The present ability and learning in the law of the petitioner is adequate," and that the petition for reinstatement should be denied. This report was approved by the Board of Governors.

Petitioner urges, first, that the quoted report does not constitute findings, and that the "failure of the committee and the Board of Governors to adopt findings of fact based on the evidence was contrary to law," and, second, that the evidence would not support findings adverse to petitioner on the issues of rehabilitation and of moral qualifications. It is conceded that if more detailed findings are required on such issues they would also be necessary on that of petitioner's ability and learning in the law.

Petitioner states that he has "found no decisions in proceedings for the reinstatement of a disbarred attorney which either support or negative" his contention that he is entitled to more detailed findings, but urges that such contention is "amply supported by sound decisions in comparable cases" and cites various authorities having to do with proceedings before administrative boards. However, as reiterated in the very recent case of *Preston* v. *State Bar* (1946), *ante*, pp. 643, 650 [171 P.2d 435], "That this court has the inherent power and authority . . . to reinstate an applicant previously disbarred despite an unfavorable report upon such application by the Board of Bar Governors of the State Bar . . . is now well settled in this state. [Citations.] The recommendation of the Board . . . is advisory only but as

that body has been provided by legislative enactment as an arm of this court for the purpose of assisting in matters of admission and discipline, the greatest deference should be, and always has been, accorded to its recommendation by this court. Nevertheless, the final determination in all these matters rests with this court, and its powers in that regard are plenary and its judgment conclusive. [Citations.]'' We are satisfied that for the purpose of enabling us to make an intelligent and fair review of the decision of the board, the findings adopted by the committee and by the board are, in the light of the circumstances of this case, sufficient to advise us of the grounds upon which the decision is based. (*Cf. In re Cate,* 77 Cal.App. 495, 499, 508 [247 P. 231]; *In re Stevens,* 83 Cal.App. 745, 746-747 [257 P. 218]; *In re Cate,* 207 Cal. 443, 445, 449 [279 P. 131].) Likewise, we are satisfied that petitioner, on this record, is not prejudiced by a lack of greater particularity in the findings.

From the record of the several hearings it appears that petitioner was born December 30, 1893, and that following his admission to practice in California (in 1920) he practiced law in San Francisco until July, 1923, and in Long Beach from that date until his suspension in June, 1932. As stated above, his conviction on the criminal charges and admission to probation took place in December of the same year, and his disbarment in June, 1933. From May, 1933, until the time of his petition for reinstatement and the hearings thereon (held September 3, 1943, to April 23, 1945) petitioner supported himself and his wife by engaging in various employments and independent undertakings, including the selling of fruit juices, election campaign work, the newspaper and the contracting business, and the operation of a gasoline service station. During the early portion of this period he apparently also supported two, and possibly three, sons who had not yet reached majority. In May, 1935, further and even more grievous misfortune beset petitioner. His eldest son was shot and killed in an attempted holdup of a San Pedro market in which the son was employed. In the fall of 1937 petitioner's mother died after a long and expensive illness, the financial burden of which he had borne. These adversities seemed greater than petitioner was then prepared to face. He sought escape for a time by indulgence in excessive drinking, but in December, 1937, he closed his pub-

lishing business and, at the instance of friends and with his own acquiescence, was committed the following month to Patton State Hospital, where he remained for six months.

In June, 1938, petitioner returned to Long Beach and according to his testimony has since then indulged in no intoxicating liquors except for three "social cocktails" at widely spaced intervals. He states in his petition for review that "For all practical purposes" his rehabilitation "commenced with his return to Long Beach in the summer of 1938." Thereafter, he secured employments including on several occasions the satisfactory handling of political campaign funds amounting to several thousands of dollars. At the time of the hearings on the petition for reinstatement petitioner was engaged in operating a service station as his own business and also had occasional temporary employment as Chief Investigator for the California Legislature's Interim Committee on Juvenile Delinquency. He estimated his average monthly earnings from 1933 until his commitment to Patton in January, 1938, as $100 and from the summer of 1938 through 1940 as $200. During 1941 his only income was $200 per month lent to him by Mr. Thomas A. Gregory, president and manager of the Long Beach Building and Loan Association, from Gregory's personal funds. From February, 1942, to the time of the hearings petitioner's average monthly earnings were $225 and those of his wife, which petitioner stated belonged to her for her own use, from about the middle of 1942 were $140 per month. He estimated the monthly living expenses of himself and his wife as of January, 1944, at $185, and stated that he was also contributing $25 per month to the support of his father, although such contribution was not essential to his father's comfort.

In addition to the Tippie and the Morrison matters, mentioned hereinabove, petitioner since his disbarment has been named as a defendant in various civil actions, certain of which were dismissed, settled, not prosecuted, or resulted in judgments in petitioner's favor, and others of which resulted in judgments against petitioner totaling over $11,000. It appears that none of such actions were based on acts of moral delinquency on the part of petitioner, and he testified that he intends to satisfy or settle the judgments against him when he is able so to do. In March, 1937, as the result of a dispute with an employee over wages, a complaint was filed against petitioner in the municipal court in Long Beach charging

him with violation of the state wage law; the matter was settled and the complaint dismissed.

In addition to the $2,400 borrowed from Mr. Gregory, petitioner at the time of the hearings owed to a savings and loan association approximately $1,200, secured by a trust deed on real estate standing in the name of petitioner and his wife. Petitioner testified that this property rented for $45 to $50 a month, which "pays for the taxes."

Concerning restitution of the $9,601 to the Fitzgerald estate—ordered in December, 1932, as a condition of petitioner's probation—Miss Morrison, the administratrix, testified that petitioner had paid to her a total of only $1,123.50 of which she received approximately $623 through the "court trustee"; that in addition she had been paid $4,000 by a securities company involved in the misappropriation by petitioner; that in 1937 petitioner stated to her and to the court "that he had been left sole heir in the mother's will" and that he would pay the Fitzgerald estate "out of what he received from his mother's estate," but that the witness subsequently learned that petitioner was to receive nothing from that source; that she had at no time received any of the securities or property mentioned in the civil judgment secured by her against petitioner or any reimbursement derived from the securities; and that she had not been consulted concerning petitioner's pardon before it was granted. The record disclosed that Miss Morrison was paid the $4,000 by the securities company pursuant to an agreement that she would repay that amount to the company from the first sums collected by her on account of her judgment against petitioner.

Mr. Joseph Wapner, the attorney who represented Miss Morrison in the civil action which resulted in the $9,601 judgment against petitioner, testified that he had made no independent investigation of the securities "but I felt they were worthless. . . . I don't recall just how I did reach the conclusion. . . . I think I did tell Mr. McArthur and his attorneys on many occasions that I felt that any security that they would offer was absolutely worthless. . . . After I came into it and after going over the matter with my client and my predecessor, Mr. Lyter, we came to the conclusion that these so-called securities were absolutely valueless. That was why I filed . . . suit against Mr. McArthur"; that he did not attempt to realize on the securities because he "thought there wasn't sufficient there to warrant the effort and expense."

It is not contended that petitioner had made any greater cash payments than those testified to by Miss Morrison. Petitioner stated that he was originally ordered to pay $25 per month as a condition of probation, but that he was unable to do so; that prior to his commitment to Patton (in January, 1938), he had delivered to the probation officer approximately six "bad checks" ranging in amounts from $10 to $50, each of which was paid in full within five or six days after it was issued; and that "Shortly after I returned from Patton . . . I started paying $10 a month regularly from then on." The record indicates that the payments made by petitioner to Miss Morrison through the probation office amounted to $258.50 before the Patton commitment plus $340 during the years 1939 through 1941; and that thereafter he made only two payments, one of $15 in October and the other of $10 in November, 1942.

It is undisputed that in applying for the pardon petitioner represented that he had made restitution by repaying the sums misappropriated from the Fitzgerald estate and that after the pardon was granted he made no further payments. In defense and explanation of such conduct, petitioner testified as to his opinion of the value of the collateral securities mentioned above and stated that at the time he turned them over to Miss Morrison's attorney "The figures that I had . . . showed that the value at the time . . . was in the neighborhood of $10,000 or a little better. . . . I felt and represented [to the advisory pardon board] that everything I had turned over . . . represented more than the actual amount of the judgment that was against me. Now the fact that they hadn't realized on those I didn't consider to be my fault because they were . . . in a position to do so"; that he had turned over to Miss Morrison or her attorneys everything of value which he had except a mountain cabin worth $750 to $800; that he had no control over the securities after they were delivered to Miss Morrison's attorneys, and that he had "endeavored unsuccessfully . . . to bring about a liquidation of those securities so as to have a credit against" the judgment; that he did not recall whether when applying for a pardon he had disclosed that the judgment of $9,601.10 remained unsatisfied of record, but that "It is possible that . . . the representation was not made that the judgment was unsatisfied because . . . during the pendency of the pardon it was suggested to me by I think either [the] . . . secretary to the Governor,

or [the secretary of the advisory pardon board] . . . as a matter of good faith if there is any difference between the values, that I should put in the Governor's hands a note for $1,000. That note was executed and sent to [one of the named secretaries]'' and that neither Miss Morrison nor her attorney was consulted concerning the note, which was unsecured. The record indicates that the note disappeared without being delivered to the Fitzgerald estate.

Petitioner testified further that Miss Morrison's attorney had informed him that the balance owing on the $9,601 judgment could be settled for $1,500, that petitioner was attempting to settle for only $1,000, which he expected to borrow from other sources, and that such attempts were ''partly the reason'' for his ceasing to make payments on the judgment after his pardon was granted; that ''The payments had extended over a period of time and I was endeavoring to get a lump sum settlement''; that he did not regard it as his obligation to continue monthly payments; that ''I don't know as I can give . . . categorically a reason as to why I discontinued the payments except that I had in mind the filing of this petition [for reinstatement] at that time. I felt that if I refused to make any further payments it would be best for me to come to this committee with a clear-cut settlement of the obligations to the Fitzgerald Estate. I knew of no other way. I had made numerous attempts in the past, and the reason was I tried to get some opinion from the Fitzgerald Estate as to what they would require me to pay to close up that judgment.'' Petitioner was informed by the three members of the special committee that unless he disclosed other justification for cessation of the payments to Miss Morrison upon the granting of his pardon, they would vote against reinstatement. The record indicates that subsequently, on February 1, 1945, petitioner delivered to Miss Morrison's attorney an installment note for $1,250 signed by petitioner and payable to Miss Morrison at the rate of $25 a month commencing February 1, 1943, and paid $1,250 in cash to her plus the first $25 monthly installment on the note and $1,250 cash to the securities company involved in his misappropriations, and received in return a full satisfaction of the judgment against him together with the securities described in the judgment, and that evidence of this settlement was submitted to the committee at the final hearing on April 23, 1945.

Concerning petitioner's handling of political campaign funds, four Long Beach businessmen, including one attorney, testified that petitioner collected and accounted for such funds and that in their opinion he was honest and rehabilitated. Another witness, who testified that he felt that petitioner had been rehabilitated, stated that his opinion was based upon a statement made to him by petitioner that the latter had made full restitution of the misappropriated sums. A newspaper publisher and member of the city council in Long Beach, testified that in 1934 and 1935 petitioner while an employee of the newspaper satisfactorily collected and accounted for funds owing to the paper, and that the witness had discussed legal matters with petitioner and considered him to be a "pretty smart attorney." Two attorneys called by petitioner also testified that they frequently discussed legal matters with petitioner, that his legal ability was good, and that he appeared to be keeping up with new developments in the law.

Upon an application by a disbarred attorney for reinstatement, the object of the court, as observed in *Kepler* v. *State Bar*, 216 Cal. 52, 55 [13 P.2d 509], "is to determine whether or not the character of the applicant is such that he should be admitted to an office of trust, and recommended to the public as a trustworthy person, fit to be consulted by others in matters of confidence. [Citations.] In such proceeding the burden of proof is upon the one who seeks, after disbarment, to accomplish a restoration to the ranks of the legal profession, and before the court may grant the petition for reinstatement, it must be satisfied and fully convinced by positive evidence that the effort he has made toward rehabilitation of his character has been successful. [Citations.] It is only reasonable that the person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. . . . The proof presented must be sufficient to overcome the court's former adverse judgment of applicant's character. [Citations.]" (See, also, *Wettlin* v. *State Bar*, 24 Cal.2d 862, 869 [151 P.2d 255].)

The showing made by petitioner, as related above, does not convince us that he has so rehabilitated himself that he should be reinvested with the position of trust and confidence that is held by an attorney at law. The record is clear

that even at the time of the hearings before the special committee he had not become impressed with a sense of his moral obligation to repay the sums he had misappropriated from the Fitzgerald estate, and that his chief concern was to employ such means or methods as he could devise to secure a satisfaction of the judgment for the smallest amount possible. Despite the fact that his earnings from the beginning of 1942 to the time of the hearings averaged $225 monthly and that during the greater portion of that time his wife was also earning $140 a month, he paid only $25 to Miss Morrison in 1942, and subsequent to the granting of his pardon in December, 1942, suspended payments entirely. He testified that such cessation of payments was made in an effort to secure a settlement of the judgment for $1,000, although he admittedly had repaid only $1,123.50 of the $9,601 misappropriated. We are not impressed with his argument that the securities delivered by him to Miss Morrison's attorneys were of a value in excess of the judgment; his testimony as to their value was unsubstantiated by any other evidence whatsoever, and Mr. Wapner, Miss Morrison's attorney, stated that he and his predecessor were convinced that the securities were not worth the effort and expense of attempting to realize upon them. The fact that in submitting his pardon application petitioner, without consulting or notifying Miss Morrison or her attorney, represented that he had made full restitution indicates that he himself was not so convinced of the value of the securities that he was willing that a complete disclosure of the whole transaction be made. And the final settlement of the judgment, secured in the interim between the final two hearings before the special committee, was negotiated by petitioner in a frank attempt to alter the announced intentions of the committee members to vote against his reinstatement. As indicated above, this settlement meant that petitioner paid in cash a total of only $3,648 of the $9,601, and gave an unsecured note on which was owing an additional $1,225.

Payments made or settlements obtained by the means and under the circumstances depicted here fall far short of displaying that high integrity and awareness of legal and moral obligations demanded as a matter of course of a member of the bar of this state. As explained in *Wettlin* v. *State Bar, supra,* 24 Cal.2d 862, 869, ''We do not mean to hold that it is necessary for a disbarred attorney in all cases to make full

restoration in order for him to show that he has sufficiently rehabilitated himself to be entitled to be reinstated as a member of the bar. As stated in the case of *In re Andreani* [1939, 14 Cal.2d 736, 750 (97 P.2d 456)] . . . 'The importance of making restitution and a conclusion respecting the weight which should be attached thereto, should be determined largely by the financial or other ability of the attorney to restore that which he has misappropriated, as well as by his attitude of mind regarding the matter.' In that case no restitution whatever was made, yet the applicant was reinstated. In other cases only partial restitution has been required, but in all cases even when full restoration is made, the applicant must show a proper attitude of mind regarding his offense before he can hope for reinstatement. In other words, he must produce satisfactory and convincing proof that in his efforts to reform his ways he has been reasonably successful. The evidence in petitioner's behalf does not meet this test. . . ." Nor, for the reasons above stated, does the evidence in the matter now before us convince us that petitioner should be reinstated.

The application of petitioner for reinstatement is denied.