[S. F. No. 17886.   In Bank.   Apr. 28, 1950.]

LEWIS K. BEEKS, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Lewis K. Beeks, in pro. per., John Adams, Jr., and R. J. Reynolds for Petitioner.

Jerold E. Weil for Respondent.

THE COURT.—Petitioner seeks reinstatement as a member of The State Bar of California. His application has been refused favorable recommendation by the Board of Governors of The State Bar. (Rules on Appeal, rule 59(b).) We have concluded that for the reasons which hereinafter appear reinstatement should be denied.

Petitioner is now 58 years of age and has a dependent wife and two daughters, as well as an adult daughter who is self-supporting. He holds a Bachelor of Arts and a Bachelor of Laws degree from Howard University in Washington, D. C. In 1923 he was admitted to practice law in California. Thereafter he practiced continuously in Los Angeles until his disbarment in July, 1934, following conviction in the municipal court in Los Angeles of the crime of petty theft of $25 and recommendation of disbarment from the Board of Governors based upon the conviction record and upon the records in disciplinary proceedings hereinafter more fully discussed. For the misdemeanor offense petitioner received a sentence of six months in jail, upon which he was granted probation provided he serve thirty days in jail and make restitution. He complied with both conditions.

The various transactions upon which were based the disciplinary proceedings leading to the disbarment of petitioner, together with the evidence concerning his subsequent efforts to make restitution, adduced at reinstatement hearings in November and December of 1947 and January of 1948, are as follows:

1. *The Spotts Matter.* Petitioner misappropriated the sum of $127.98 which he had received as attorney for Mr. Knox, the executor of the estate of Ella B. Spotts, deceased, to be used in paying certain charges against the estate. He falsely told the executor the money had been used to redeem certain stocks. Thereafter Sam Spotts, substituted as executor, secured judgment against petitioner for the $127.98, against which petitioner was entitled to a credit of $50 as attorney fees allowed him for services to the estate, leaving $77.98 owing from him to the estate at the time he was disbarred (1934).

Petitioner testified at the reinstatement hearings that in the summer of 1946 he wrote Mr. Spotts, after first securing his supposed address from the widow of Mr. Knox, but received no reply. Petitioner stated, however, that thereafter he inspected the court records of the judgment and "found that . . . the judgment had been assigned to some S. A. Shepard, but who S. A. Shepard is or where he is, I don't know, I have never heard anything from him nor received any information . . . I asked Mrs. Knox and I never could get in touch with Mr. Spotts to find out from him whether he knew, or what, who Mr. Shepard was . . . I wanted to see . . . to whom I was to pay it since Mr. Spotts didn't answer my letter, and Mrs. Knox said she didn't know what to do about it . . . I never received any information whatever from Mr. Spotts . . . I wouldn't have gone to that trouble if I hadn't intended to pay it." Petitioner further testified that he learned from the court records the name of a Los Angeles attorney who represented Shepard, but instead of communicating with the attorney in an effort to pay the judgment, petitioner referred the matter to another Los Angeles attorney in an effort to work out a set-off against Shepard. The record indicates no other attempts by petitioner to locate either Spotts or Shepard, or to pay the $77.98. He stated that he is nevertheless ready to pay the money to whomever it is due.

2. *The Brice Matter.* Mr. Brice, petitioner's client, delivered $30 to petitioner for the purpose of procuring an appeal

bond in an action wherein Brice was plaintiff and had failed to recover judgment. Petitioner filed notice of appeal after the time therefor had expired, but nevertheless told Brice an appeal had been taken and the bond filed. Thereafter, without Brice's knowledge petitioner filed a new action in Brice's name, caused such name to be signed to the verification of the complaint, and as notary public purported· to authenticate Brice's pretended signature and oath. Petitioner failed to appear in court when the second action was called for trial, and it was dismissed for lack of prosecution. Petitioner paid the $30 secured from Brice to two sureties on an appeal bond. They failed to qualify, but petitioner allowed them to retain the money for their time and trouble. Although petitioner has not offered to repay the $30 to Brice, he points out that the record does not indicate that Brice ever accused him of misusing the money or ever demanded its return. Petitioner testified that Brice stated he would do nothing to hinder petitioner's efforts to be reinstated to practice.

3. *The Harper Matter.* Petitioner received certain sums of money (the aggregate amount is uncertain but apparently the total was somewhere between $75 and $200) to be applied upon an indebtedness of his client, Mrs. Harper. He failed to so apply $25 of such sums, and the municipal court conviction of petty theft resulted. As stated hereinabove, petitioner made restitution of the $25 as a condition of probation. A deed of trust which secured Mrs. Harper's indebtedness was foreclosed,* an unlawful detainer suit was brought against her, and a writ of possession was secured and delivered to a constable for service. Before such service was made, petitioner knowingly and wilfully caused to be served upon the constable a copy of a purported order to show cause and restraining order halting the proceedings, although petitioner knew that the court had refused to sign the original of such order. The copy bore the name of a judge, written in longhand, on the signature line. Petitioner failed to appear at the time and place set for the hearing on the purported order to show cause.

4. *The United Brothers of Friendship Foreclosure Matter.* Petitioner, as attorney for The United Brothers of Friendship, was paid by that organization the sum of $50 to be used as

---

*The administrative committee, before whom the hearings in the disciplinary proceedings on this matter were held, was not certain from the record that the foreclosure resulted from any failure of petitioner to properly apply the monies entrusted to him.

expenses in the foreclosure of a deed of trust. Petitioner failed to prosecute the foreclosure, but falsely informed the members of the organization that the trust deed had been foreclosed, that he would produce the trustee's deed, and had paid the $50 into escrow therefor. Subsequent to disbarment, petitioner (in 1935) sued the organization for certain sums as professional fees, and credited the $50 against the settlement.

5. *The United Brothers of Friendship Interpleader Matter.* Petitioner advised the organization to file an interpleader action against two adverse claimants to the proceeds of a life insurance policy (or benefit certificate). The committee before whom the disbarment hearings were held found that he was instructed to file the suit but failed to do so, with the result that by reason of the negligence each claimant recovered judgment against the organization for the full amount of the policy, which appears to have been $300. Petitioner represented the organization as attorney in each of the two actions and was paid for his services. Petitioner denies that he was instructed to file an interpleader action and has made no effort to reimburse the client on account of the double payment.

6. *The Lizzie Jones Loan Matter.* Petitioner told Lizzie Jones that he needed to borrow money because of difficulties with The State Bar. She executed and delivered to petitioner a note for $700, secured by a trust deed on her home, and petitioner promised to give her a deed to certain land in Watts, California, but failed to do so. The note was payable to petitioner's wife. At the reinstatement hearings petitioner testified that he had succeeded in raising $352 on the $700 note which Mrs. Jones had executed, that he considered this amount to be a loan which he should repay, and that the difference between the $700 face of the note and the $352 represented compensation to him for legal services he had rendered Mrs. Jones. He further stated that at one time Mrs. Jones had demanded $1,000 from him, but that he was willing to pay only $352, plus interest from the date of the loan; and that although he could pay the total, he would prefer paying at the rate of $50 down and $25 a month. He also placed in evidence a letter from Mrs. Jones' present attorney stating that the latter had advised her that $350 was a just settlement of her claim, and a letter from Mrs. Jones stating that "if Mr. Beeks will make us his own terms and live up to his agreement I will not stand in the way of his being reinstated."

7. *The Lizzie Jones Guardianship Matter.* Mrs. Jones, as guardian of two minors, delivered to petitioner stock certificates of the guardianship estate, with instructions to sell them to raise support money for the minors. At the time of the disbarment petitioner had delivered no money to Mrs. Jones on account of the stock, and the record is not clear as to whether he had then returned the certificates to her. However, evidence at the reinstatement hearings indicates that petitioner delivered all of the stock to Mrs. Jones either prior to or shortly after disbarment.

8. *The Will J. Mallard Matter.* Petitioner misappropriated the sum of $90 which had been delivered to him by his client, Mallard, defendant in a divorce matter, to be applied to attorney's fees and costs awarded to the plaintiff wife. At the reinstatement hearings petitioner testified that Mallard, before his death in 1940, had agreed that petitioner might set off the $90 against sums owed him by Mallard for legal services; that petitioner had made a written record of the settlement but could not locate it.

9. *The Annie Rose Matter.* Annie Rose employed petitioner to handle new trial proceedings in an action in which judgment had gone against her, and paid him $10 for services in connection therewith. He was substituted as her attorney and led her to believe new trial proceedings were about to be heard, although the time therefor had expired.

*Evidence pertaining to rehabilitation.* Following disbarment, petitioner was employed from the fall of 1934 until November, 1935, as assistant to the Adult Probation Officer of Los Angeles County. His duties consisted of making periodic checks upon the reports of probationers, investigating those who failed to report, and other office duties as assigned. From February, 1936, until the fall of that year petitioner was employed by the Bureau of Census of the United States Department of Commerce as a field, or outdoor, worker. From January to November, 1937, he worked as a clerk with a governmental survey unit, doing "research work, contact work, reading, library work." From January to November, 1938, petitioner was a clerk on another government survey project and was engaged in "checking houses . . . to see what was needed in the way of repairing and making a report." From December, 1938, to June, 1942, he was employed as a research attorney on a survey of laws relating to trade barriers, which was sponsored by the U. S. Department of Commerce. During the same period he was also asso-

ciated with Loggins Food Products, a catering firm in Los Angeles, and was entrusted with collections (which occasionally reached the sum of $1,000 per day), banking, and other duties, which he fulfilled honestly, efficiently, and to the satisfaction of the proprietors. Whether the collections were in cash or in checks does not appear. During the Christmas holiday periods of 1935 through 1939 petitioner also acted as substitute clerk in the Los Angeles post office. Since August, 1942, he has been employed in various shipyards in the San Francisco-Bay area.

Petitioner states that from 1934 to 1942 his average income was $100 a month, and since 1942 he has averaged $200 a month. At the time he petitioned for reinstatement his only financial obligation, aside from the matters involved in the disbarment proceedings, was a balance of $2,300, payable at the rate of $30 monthly, on the purchase price of a home occupied by petitioner's wife and daughters in Los Angeles. Petitioner had purchased the home for $7,000 in 1932, and was making the payments regularly. He also contributed an additional $10 to $25 weekly to the support of his wife and daughters.

Seven friends and acquaintances of petitioner testified that during the preceding several years he had attended church regularly and had conducted himself as a man of good moral character. Among these witnesses were petitioner's landlady in San Francisco, whose rents in an unspecified amount he had satisfactorily collected and accounted for during a period of six to eight months, the owner of a restaurant where he ate regularly, and the business representative of the union to which he belonged in connection with his shipyard work. Petitioner also introduced some 20 letters affirming his present good moral character and recommending his reinstatement, including letters from a judge of the superior court in Los Angeles, and from five Los Angeles attorneys. The judge wrote of petitioner, "I believe that, if reinstated, he would make a worthy member of the Bar."

None of the seven witnesses who personally testified as to petitioner's present character had knowledge of the grounds upon which he was disbarred. Prior to 1933 he had handled a divorce matter for one of the witnesses, but her association with him had been only of a social nature since 1942. The union representative testified that petitioner was a steady, responsible worker, but that he had had no money transactions with petitioner. The landlady for whom petitioner had

handled rents stated that he was quiet, well-behaved, a gentleman, and attended church. The restaurant proprietor testified that she thought petitioner was a gentleman, but that "I know nothing of Mr. Beeks." The other three witnesses had had no business transactions with petitioner, but testified that from social contacts they felt he was rehabilitated and could be trusted.

In a letter addressed to the Special Administrative Committee before whom the reinstatement hearings were held, the proprietors of the Los Angeles catering firm with whom petitioner was associated in 1938 to 1942 state that their business now "grosses at times four (4) and five (5) thousand dollars per week. And irrespective of the expansiveness of our business and of his disbarment, we offer him at any time a place in our establishment.

"We firmly believe in his honesty and integrity and feel that his conduct since disbarment has been that of a loyal father, a constant, faithful and efficient worker and the conduct of one who merits any and every consideration that can be given for a person who has honestly tried.

"If reinstated he will be without question our legal advisor and counsellor."

All except one of the other letters introduced by petitioner to establish his present good character were likewise from persons residing in Los Angeles, whereas petitioner has lived and worked in the San Francisco area since August, 1942.

Concerning petitioner's present learning and ability in the law, he testified that during the year 1947 he visited the law library in San Francisco at least once a week, where he read advance sheets and checked the law on various matters of current interest; that from December, 1938, to June, 1942, as a law abstractor for a survey sponsored by the U. S. Department of Commerce he abstracted laws and reviewed the codes of various states, including California, on trade barrier matters. He also placed in evidence two briefs he had prepared in 1946 as an accommodation to another attorney in an appeal before the Appellate Department of the San Francisco Superior Court; that attorney testified that when the briefs were prepared he was not aware of petitioner's disbarment, but that "I think he [petitioner] is capable of practicing law."

The local administrative committee concluded that "petitioner has rehabilitated himself . . . and that his present moral qualifications are such as warrant his readmission to the practice of the law. Based upon its observation of petitioner

during the hearing and upon its consideration of the evidence submitted by petitioner on the issue of his present ability and learning in the law, the Committee seriously doubts whether such ability and learning qualifies petitioner for the practice of the law. The Committee considers this issue to be a particularly important one in petitioner's case since it is of the opinion that petitioner's original difficulties, which led to his disbarment, were primarily attributable to his inability and lack of learning as an attorney and that if petitioner is readmitted without adequate proof of his present ability and learning in law the risk that he may again be subjected to temptations which would lead to violations of professional ethics and require new disbarment proceedings would be substantial. It believes that petitioner should not be reinstated . . . unless he successfully passes the written examination required of general applicants for admission to the Bar.'' The committee unanimously recommended that ''petitioner be permitted to take the regular written examination required of all general applicants for admission . . . and that if he successfully passes . . . he be reinstated . . .'' Thereafter, petitioner filed with the Board of Governors of The State Bar a statement that he ''has no aversion to taking the regular written examination required of all general applicants for admission to practice law in California . . . [and] supports the recommendation of the Special Administrative Committee . . .'' By a vote of thirteen to one, the Board of Governors after considering the record found '' (1) The petitioner has not the high moral qualifications required of a member of the Bar . . . [and] is not sufficiently rehabilitated to warrant his reinstatement; (2) The petitioner is not fit for readmission to the practice of law in this state,'' and declined to recommend his readmission subject to taking the bar examination or at all.

In *McArthur* v. *State Bar* (1946), 28 Cal.2d 779, 788 [172 P.2d 55], we reaffirmed the principle that ''Upon an application by a disbarred attorney for reinstatement, the object of the court, as observed in *Kepler* v. *State Bar,* 216 Cal. 52, 55 [13 P.2d 509], 'is to determine whether or not the character of the applicant is such that he should be admitted to an office of trust, and recommended to the public as a trustworthy person, fit to be consulted by others in matters of confidence. [Citations.] In such proceeding the burden of proof is upon the one who seeks, after disbarment, to accomplish a restoration to the ranks of the legal profession, and before the court

may grant the petition for reinstatement, it must be satisfied and fully convinced by positive evidence that the effort he has made toward rehabilitation of his character has been successful. [Citations.] It is only reasonable that the person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question . . . The proof presented must be sufficient to overcome the court's former adverse judgment of applicant's character. [Citations.]' (See, also, *Wettlin* v. *State Bar*, 24 Cal.2d 862, 869 [151 P.2d 255].)''

■ Here, as in the McArthur case, the showing made by petitioner does not persuade us that he is so rehabilitated that he should again occupy the position of trust and confidence that is held by an attorney at law. As appears hereinabove, the disciplinary proceedings prior to petitioner's disbarment involved nine separate items of misconduct, including misappropriation of clients' funds on at least four occasions (the Spotts case, the Harper case, the United Brothers of Friendship foreclosure case, and the Mallard case). In the Spotts matter petitioner has not repaid the principal sum of $77.98 owed to the Spotts estate when he was disbarred in 1934, and he has failed to convincingly show that he has made a diligent and sincere effort to learn to whom the money should now be paid and to pay it. Such effort as he has made apparently has been directed toward seeking to arrange a settlement of the claim against him by the same method he employed in the foreclosure case and, according to his testimony, in the Mallard case; i. e., by set off against other claims. Restitution in the Harper case was made under compulsion, as a condition of probation. In the Brice matter petitioner has made no offer to repay the $30 received from his client. In the United Brothers of Friendship interpleader case petitioner denies responsibility for his client's loss of $300 and has made no effort at reimbursement. In the Lizzie Jones loan matter he was able to repay the full amount he claimed was owing, but stated he would prefer installment payments.

On several occasions this court has observed that ''We do not mean to hold that it is necessary for a disbarred attorney in all cases to make full restoration in order for him to show that he has sufficiently rehabilitated himself to be entitled to be reinstated as a member of the bar. As stated in the case of *In re Andreani* [(1939), 14 Cal.2d 736, 750 (97 P.2d 456)] . . . 'The importance of making restitution and a conclusion

respecting the weight which should be attached thereto, should be determined largely by the financial or other ability of the attorney to restore that which he has misappropriated, as well as by his attitude of mind regarding the matter.' In that case no restitution whatever was made, yet the applicant was reinstated. In other cases only partial restitution has been required, but in all cases even when full restoration is made, the applicant must show a proper attitude of mind regarding his offense before he can hope for reinstatement. In other words, he must produce satisfactory and convincing proof that in his efforts to reform his ways he has been reasonably successful. The evidence in petitioner's behalf does not meet this test . . .'' (See *Wettlin* v. *State Bar*, 24 Cal.2d 862, 869 [151 P.2d 255] ; *McArthur* v. *State Bar*, *supra*, 28 Cal.2d 779, 789-790.)

Taking into consideration the entire record, including the recommendation of the Special Administrative Committee as well as the action of the Board of Governors, we are of the view that petitioner has failed to produce such clear and convincing proof that he possesses an acceptable appreciation of the duties and responsibilities of an attorney at law in relation to his clients and the courts, and the making of restitution to those whose trust and confidence he heretofore violated, as would justify our ordering either immediate reinstatement or acceptance of petitioner as an applicant for examination upon his technical qualifications.

The application of petitioner is denied.

CARTER, J.—I dissent.

I am disposed to agree with the conclusion reached by the special administrative committee which heard petitioner's application for reinstatement that petitioner had rehabilitated himself and that his present moral qualifications are such as to warrant his readmission to the practice of the law, and that he should be permitted to take the written examination required of general applicants for admission to the bar and, if he passes such examination, he should be reinstated as a member of the bar.

Approximately 14 years elapsed between the time of petitioner's disbarment and the hearing before the special administrative committee which recommended his reinstatement. This is certainly a sufficient period of time for a disbarred attorney to show by his conduct that he has accomplished rehabilitation. The special administrative committee had the advantage of hearing the testimony of witnesses

produced by petitioner, and the testimony of petitioner himself, and the members of that committee were in a better position to pass upon the factual issues than either the members of the Board of Governors of the bar, or the members of this court, who have gained whatever knowledge they have of the case from the written record.

It is well settled that the one and only issue on an application of this character is whether the applicant has been rehabilitated. (*In re Andreani,* 14 Cal.2d 736 [97 P.2d 456].) If satisfactory proof of rehabilitation is presented to the local administrative committee, and that committee finds that rehabilitation has been accomplished, it may, as a condition for reinstatement, require that petitioner show that he possesses the requisite learning in the law to entitle him to resume practice. In view of the length of time which had elapsed since the petitioner was disbarred, the committee was clearly justified in recommending that petitioner submit to an examination for the purpose of determining whether he now possesses the ability and learning necessary to qualify him to again engage in the practice of the law.

In my opinion the recommendation of the local adminstrative committee affords an ample safeguard against the reinstatement to the practice of the law of one who is lacking in either moral character or learning in the law. I would, therefore, follow the recommendation of the local administrative committee and permit petitioner to take an examination required of general applicants for admission to the bar, and if he passes such examination, that he be reinstated.