[L. A. No. 22699.   In Bank.   Feb. 1, 1954.]

ERWIN P. WERNER, Petitioner, v. THE STATE BAR OF
CALIFORNIA, Respondent.

T. B. Cosgrove for Petitioner.

Leonard S. Lyon, Jr., and Jerold E. Weil for Respondent.

THE COURT.—The petitioner, Erwin P. Werner, was disbarred from the practice of the law in 1944. In 1951 he petitioned for reinstatement. A Special Administrative Committee of the State Bar recommended that the petition be denied upon finding that the petitioner had failed sufficiently to establish his rehabilitation. The matter is now before this court for a review of the action of the Board of Governors in approving the report of the committee and in declining to recommend that the petitioner be reinstated.

The petitioner is 61 years of age. He was admitted to the bar in 1916. In 1937 by indictment he was co-charged with Helen Werner, his wife, now deceased, in count one of soliciting the offer of a bribe in violation of section 653(f) of the Penal Code and in the second count of attempted grand theft. The petitioner was acquitted on the charge stated in count 1 and he and his wife were convicted on the second

count. He appealed from the judgment. She did not appeal and the judgment as to her became final. This court, in 1940, reversed the judgment against the petitioner on the ground that the evidence was insufficient to support the conviction. (*People* v. *Werner*, 16 Cal.2d 216 [105 P.2d 927].) Notwithstanding the reversal he was disbarred in supplemental proceedings based on the record in the criminal case including the record on the first count.

In the disbarment proceedings the petitioner objected to the consideration of the transcript of the criminal record. Admittedly the charges brought against him could not have been proved without that transcript in evidence. It was first considered by the committee pursuant to a stipulation entered into between the petitioner and the committee following the judgment of conviction in the trial court and pending the appeal by the petitioner therefrom. At first it was sought to disbar him on the basis of the conviction alone. Upon reversal of the judgment the order to show cause was amended to charge acts claimed to involve moral turpitude as shown by the record in the criminal case. The petitioner contended that the stipulation no longer was effective because the committee had stated a new cause of action against him, and that the stipulation was entered into only for purposes of proceedings under the original charge. The committee agreed with the petitioner and recommended that the proceedings be dismissed, but the Board of Governors ordered the committee to receive the transcript into evidence. Following those instructions and on consideration of the evidence contained in that transcript the committee recommended disbarment but the petitioner and also the committee continued to insist that the transcript was improperly in evidence. This court finally determined that it was admissible and that issue is not now open to question.

■ The burden upon one applying for reinstatement requires that he prove his rehabilitation since his disbarment. If rehabilitation be proved, the present moral qualifications of the applicant generally follow as a matter of course. It is also required that the applicant prove his present ability and learning in the law. It is conceded that the petitioner is qualified in this latter requirement, and the question of the petitioner's rehabilitation from the standpoint of his moral qualifications is the only one for consideration. He contends that he has shown rehabilitation sufficient to entitle him to

reinstatement by undisputed, pertinent facts. They will be related.

After his disbarment the petitioner was employed for several years by the Union Pacific Railroad, first as a yard clerk and later as a brakeman. While so employed he acted with credit as chairman of the grievance committee for the local labor union. Beginning in 1949 he was employed for approximately a year as a research clerk and appraiser for a member of the bar.

The petitioner has taken an active part in community affairs. On behalf and at the request of property owners in his community he successfully engaged in local planning commission matters. In 1950 he applied for and was accepted as a Red Cross Blood Bank driver and has worked diligently and well for the Red Cross since that time, donating far in excess of the number of hours required of him. He is an active member of a church in his community and regularly assists as an usher during its services.

He has endeavored to maintain an understanding of current world affairs by attending classes at a local university. He has held the law and its tribunals in high respect, and has kept himself well informed of developments in the field of the law.

Numerous members of the bench and bar and many lay witnesses testified on behalf of the petitioner. The testimony of each was to the effect that the petitioner is a man of good moral character who could be trusted with duties requiring honesty, integrity and fidelity. Among them were an attorney who had been a deputy in the office of the district attorney at the time of the criminal proceedings against the petitioner, a superior court judge who had presided at the criminal trial in which the petitioner was involved, a justice of the District Court of Appeal that affirmed the judgment of conviction, and a justice of the District Court of Appeal who sat *pro tem.* as a member of this court when the judgment of conviction was reversed. These men knew the petitioner throughout his professional career and were familiar with the events leading to and since his disbarment. The attorney who had represented the petitioner in litigation both before and after his disbarment testified that the petitioner was a man of good moral character; that they had been engaged in commercial enterprises, and that he knew of no position of trust which the petitioner could not properly hold. The testimony of many others was of similar nature.

Following his disbarment the petitioner was excluded from membership in numerous fraternal organizations requiring good moral character as a prerequisite to membership. After an investigation of the petitioner's rehabilitation and qualifications for reinstatement in those lodges, he was restored to full membership. The investigation was conducted by a judge of the superior court, acting solely in his capacity as a member of the lodges concerned. He unhesitatingly recommended reinstatement in those organizations.

It also appears that an investigation of the petitioner's rehabilitation was conducted by the Southern California Women Lawyers at the request of the State Bar in connection with the present proceedings. The report recites such an investigation and recommends reinstatement.

The recommendation against reinstatement is based on four grounds, each of which will be considered separately. The first arose out of the petitioner's testimony before the Special Administrative Committee in regard to certain disciplinary matters involving the petitioner prior to the one resulting in his disbarment. They dated back as far as 1925. In each the petitioner was absolved from any conduct which would justify discipline and the charges were dismissed. The committee questioned him at length concerning these matters for the stated purpose of "testing the petitioner's present recollection of such accusations and his attitude towards them." (See *Beeks* v. *State Bar*, 35 Cal.2d 268, 277 [217 P.2d 409].) The petitioner could not answer some of the questions asked of him because he could not remember the details of events which took place so many years before. In some instances his memory was refreshed by excerpts from documents in the possession of the committee and he conformed his answers accordingly. The committee's report suggests that if the petitioner is entitled to practice law he certainly would not have forgotten the details of previous charges against him even though they had been dismissed, and that he was evasive in some instances and was uncooperative with the committee in disclosing them.

The record does not support the conclusion that the petitioner was evasive in answering questions. It is true that he stated that he did not remember some of the details of a criminal charge made against him and his wife some 16 years before (1936) and of which he was acquitted, but in substance he correctly answered the questions asked of him.

Admittedly the examination had no relevancy except to test the petitioner's memory and his answers were adequate in that respect. With reference to the criminal charge the following exchange is typical of the examination:

"Q. And you still don't remember what the crime was that you were charged with conspiring to commit? A. Yes, I just stated what it was.

"Q. No, you haven't. A. It was conspiracy to violate a certain section of the Penal Code which makes it a violation to solicit a person to commit a crime. I am sure that is pretty close to the definition in the code.

"Q. Well, then, you are unwilling or unable, I take it, to state the crime that you were charged with conspiring to commit? A. I am not unwilling. I may be unable to. That is as close as I can come to it. I can give you all the facts. They are very vivid in my mind. I would be very happy to tell you anything about it. I am not trying to avoid anything, but as far as defining the thing, I have a hesitancy in doing it further than I have when the indictment is right at hand. If it is that sort of particularity that you want to find, I would be glad to read it to you and discuss it in detail."

There was other examination on the same subject, none of which shows an unwillingness to cooperate.

■ The second ground asserted to show a lack of good moral character consists of the petitioner's conduct in relation to oil well interests owned by him and associates. The petitioner with one W. J. Frick and others entered into a joint venture or partnership to drill a well located in Puente from its then depth of 2,000 feet to 4,200 feet in an endeavor to strike oil. The venture was unsuccessful. About the same time the parties became interested in a drilling operation in Moab, Utah. Frick testified that he did not keep abreast of developments, and relied upon the petitioner for information; that in December, 1950, he became disinterested in the Moab venture and suggested to the petitioner an exchange of his (Frick's) Moab interest for the petitioner's Puente interest. Such an exchange was carried out at that time. In January, 1951, there appeared a report in a local newspaper that the Moab well had come in, with an estimated flow of from 2,000 to 5,000 barrels daily. Shortly thereafter Frick met with the petitioner, and according to Frick's testimony he accused the petitioner of such knowledge of the reported favorable conditions at the Moab well as placed a duty upon

the petitioner to reveal his information to Frick at the time the latter suggested the exchange of interests.

The petitioner denies that he had information that there were favorable indications at the Moab well. Following the report but without knowledge that the well was mistakenly reported to have come in, he discussed the transaction with the Fricks and because of their dissatisfaction with the exchange he retransferred to Mrs. Frick one-seventh of their interest without cost to her. In fact the report about the Moab well was unfounded and it never produced oil in commercial quantities.

The evidence is insufficient to support a finding that the petitioner exercised bad faith in the oil transactions. There is no proof that he had knowledge favorable to Frick which should have been revealed to him. The exchange of interests was made at Frick's suggestion and to accommodate him, and at a time when it appeared from a newspaper report that the property might be valuable. Frick himself testified that "I have found my dealings with Mr. Werner satisfactory in every respect, with the one exception . . . [failure to tell him of the rumor which was unfounded that the well had come in]. Other than that, I have found him honorable and ethical in everything he has done."

The committee seems to have attached much significance to the fact that the Puente and Moab ventures were not mentioned in the petition for reinstatement under the provisions of rule 43(d) of the Rules of Procedure of the State Bar. That rule provides for a disclosure of the "nature of petitioner's occupation in detail during said period, with names and addresses of all partners, associates in business, and employers, if any, and the dates and duration of all such relations and employments." The report of the committee states that the petitioner intentionally omitted to disclose the oil ventures in his petition because they might be deemed unfavorable to him as not only involving the transactions with the Fricks but also that they would disclose that one of those associated in the Moab venture, a man by the name of Mason, had been convicted of a violation of the Corporate Securities Act. It also appeared that at about the time the Moab well was reported to have come in a retail merchants credit association had prepared a credit report on the petitioner which showed that the petitioner owned a substantial interest in a producing well. This information was, of course, an exaggeration. However, there is no

proof that the petitioner knew that Mason had been convicted of violating the Corporate Securities Act or that he was responsible for the credit report.

In regard to the omission of information concerning the oil ventures from his petition for reinstatement, the petitioner contends that the ventures were in the nature of investments which rule 43(d) does not require him to disclose. He stated: "Even though a partnership was involved in the thing . . . I was merely an investor, and it just didn't occur to me is all." He relies on *Farmers Auto. etc. Exch.* v. *Calkins*, 39 Cal.App.2d 390, 394 [103 P.2d 230], to the effect that data concerning one's "occupation" does not include "an isolated or semi-occasional and temporary adventure in another line of endeavor." While the petitioner undertook to inspect the oil properties, he took no part in actual drilling operations or planning in connection therewith as an occupation. We find nothing in charge number two that would reflect on the petitioner's asserted good moral character.

The third ground urged as evidence of the lack of rehabilitation is the failure of the petitioner to show that he had filled positions of a fiduciary nature or those involving the handling of money, and that he had not violated such trust or absconded with money that might have been entrusted to his care. This contention is without merit. While evidence of the nature referred to often is of probative value where it exists (*Jonesi* v. *State Bar*, 29 Cal.2d 181 [173 P.2d 793]; *Preston* v. *State Bar*, 28 Cal.2d 643 [171 P.2d 435]), evidence that the petitioner has occupied positions of trust is not a requirement of reinstatement. (See *In re Gaffney*, 28 Cal.2d 761 [171 P.2d 873].)

It is contended finally that the petitioner made unwarranted denials in verified pleadings in certain civil actions brought against him after his disbarment. Between December, 1946, and April, 1947, certain improvements were made on the premises occupied by the petitioner and his wife. According to the undisputed evidence they were contracted for by the wife who took sole charge and supervision of the improvements.[1]

The improvements were completed on April 4, 1947. Mrs. Werner passed away on the 12th of the following month. On

---

[1]It should be noted that much of the petitioner's troubles arose from the conduct and activities of his wife. The petitioner does not charge this nor intimate that it is so, but the record in the criminal case which formed the basis of the evidence on which he was disbarred plainly indicates its truth.

August 20, 1947, two mechanics' lien suits were filed in the municipal court, one claiming a lien for $789.87 for labor and the other claiming a lien for $344.92 on account of materials furnished. The complaints were in the usual form and were verified. Paragraph V of one complaint and Paragraph VI of the other contained the allegations that the petitioner had contracted for the materials and labor in the sums stated. The petitioner in his answers specifically denied, in accordance with the facts, that he had contracted for the expenditures, and the questions of the amounts were also put in issue.

Paragraph X in one complaint and Paragraph XI in the other each contained the allegation that the claim of lien had been filed of record, giving the book and page of recordation in the office of the county recorder. The denials as to these two paragraph, in the same form as the denials of other paragraphs of the complaints, 12 in number in one case and 13 in the other, were as follows: ''Denies each and every allegation contained in Paragraph [X in one, and XI in the other] of plaintiff's complaint.'' The answers were verified in the usual form by the petitioner as the defendant in each case. It is only the denials as to Paragraphs X and XI that are subjected to criticism.

The committee charged that by verifying the denials of the allegations of the filing and recordation of the claims of lien the petitioner ''recklessly trifled with the oath of verification.'' The charge is based on the rule of pleading that a denial of the alleged existence of a public record is insufficient, and the argument is advanced that such a denial is proof of a lack of good moral character.

In answer to this criticism the petitioner contends that his conduct was justified because of the situation in which the litigation had placed him, namely: that the contracts under which the liens arose were oral and indefinite; that they were all made by his wife; that he was not personally aware of what obligations she had incurred or what work or materials had been expended; that he did not have time to make a thorough investigation of the claims including the matters of public record before he was required to answer, and that it did not appear that the notices prerequisite to the right to a lien had been given. (Code Civ. Proc., § 1184.) After he filed his answers he made the necessary investigations. He paid the claims in full before the cases were brought to trial, and the actions were dismissed.

The petitioner concedes, as he must, that the form of the denials of the existence of public records is subject to criticism. But he urges that extenuating circumstances were such as to relieve him of a charge of moral dereliction. The record shows that it was unnecessary for him to make the criticized denials for purposes of delay because other denials not subject to criticism were sufficient to put the plaintiffs to proof of their claims. The petitioner gained no advantage by making the denials in the form criticized and the plaintiffs were not prejudiced by them. An admission of or a failure to deny the allegations of recordation would not have affected the result. This may have been the preferable course since the means of acquiring knowledge of recordation were at hand and the petitioner had not examined the records. It is the availability of knowledge and a failure to obtain it in preparation for the pleading that is the basis of the rule the violation of which is criticized. The denials were admittedly improper and cannot be excused by a practice too generally indulged in. However, it is contended that the infractions were more in the field of pleading than in morals. A search of the authorities fails to reveal a case where a person making such a verification has been charged with a violation of law or, if he was an attorney, that he was charged with unprofessional conduct or subjected to disciplinary proceedings. If such a denial, verified in the usual form, is contrary to good morals and therefore an act of moral turpitude within the definition of that term (see *Lantz* v. *State Bar,* 212 Cal. 213, 218 [298 P. 497] ; *Matter of Coffey,* 123 Cal. 522, 524 [56 P. 448] ), it is feared that in the history of the legal profession in this state many a practitioner whose moral character was not otherwise questioned could have been subjected to disciplinary proceedings. In any event, such a course of action is properly criticized· and condemned as not within the required standards of pleading and practice. As applied to the circumstances of this proceeding it may not justly be said that a lack of good moral character has been shown by the form of the pleading and its verification. In other words the record does not justify the conclusion that the petitioner in making the denials in the form indicated and in verifying his answers is, because thereof, lacking in good moral character.

The petitioner has stated a sufficient case in support of his claim of rehabilitation. He is admittedly qualified as to his knowledge of the law. He has the recommendation of persons best in position to judge his moral character. It has

been stated that such a showing "should weigh heavily in the scale of justice." (*Preston* v. *State Bar, supra,* 28 Cal.2d 643, 650-651.) In addition there is other evidence beyond substantial dispute that since his disbarment he has conducted himself in his employment and within his community in a manner entitling him to a declaration of rehabilitation.

This court has plenary power to reinstate where it is shown that the applicant possesses the requisite learning and moral character and has an acceptable appreciation of the duties and responsibilities of an attorney at law. This, we conclude, is such a case.

The petition is granted. It is ordered that the petitioner be reinstated upon the roll of attorneys at law in this state upon payment of the fees and taking the oath required by law.

Gibson, C. J., did not participate.

CARTER, J.—I concur in the judgment that petitioner be reinstated as a member of the bar of this state, but I cannot refrain from pointing out that the decision of the majority here is definitely out of line with recent decisions of this court in *Feinstein* v. *State Bar* (September 16, 1952), 39 Cal.2d 541 [248 P.2d 3] and *Roth* v. *State Bar* (February 25, 1953), 40 Cal.2d 307 [253 P.2d 969], in both of which cases I dissented. In fact, the showing in both the Feinstein and Roth cases in favor of rehabilitation was much stronger than the showing made by the petitioner here and there was no showing whatsoever in either of those cases against rehabilitation. In the Feinstein case the petitioner had been disbarred for over ten years and in the Roth case for over eight years, while in the case at bar only seven years had elapsed between the disbarment and the application for reinstatement. Neither the Feinstein nor Roth case is cited in the majority opinion and the rule announced in those cases with respect to the showing required in support of a petition for reinstatement is not even mentioned.

I take the same position here that I took in the Feinstein and Roth cases that where the uncontradicted evidence shows that petitioner has, since his disbarment, lived a useful and honorable life, kept gainfully employed and has gained, and held, the respect and confidence of the people with whom he has associated and dealt for many years, he has met the burden cast upon him to establish his rehabilitation. I believe such

a showing was made in this case as well as in the Feinstein and Roth cases.

The standard of moral character required of those who are permitted to practice law in this state should be the highest possible. A license to practice law places the holder in a position where he may impose upon the ignorance or credulity of his clients to their detriment if he is so minded, and it is the responsibility of the State Bar and of this court to protect the interests of the public by eliminating, from the profession, those who have shown by their conduct that they are lacking in the moral character requirement. The problem of reinstatement of a disbarred lawyer is always a difficult one. It has been correctly stated that the principal issue is rehabilitation (see *In re Andreani*, 14 Cal.2d 736 [97 P.2d 456]). This issue is one of fact and must be established by evidence. Where the evidence is uncontradicted, as it was in the Feinstein and Roth cases, and shows exemplary conduct extending over a period of from eight to ten years without even a suggestion of wrongdoing, it would seem that rehabilitation had been established. If it was not established in those cases, it certainly was not established here. There should be some measure of uniformity in cases such as these if the precept of "Equal justice under law" is to have any vitality whatsoever. The concept of rehabilitation is now so firmly embedded in our law that none but the sternest martinet would refuse to apply it in cases where it has been established by the uncontradicted evidence.

The members of this court are not psychiatrists nor are they clairvoyant. Unless our decisions are based on evidence and rules of law uniformly applied, they are nothing more than arbitrary determinations which change from time to time according to the whim or caprice of the individual members of the court and we thus have a government of men and not of law.

While as heretofore stated, the showing made by petitioner in favor of his rehabilitation is not as strong as that made in either the Feinstein or Roth cases, I believe it is sufficient to warrant his reinstatement, and I therefore concur in the conclusion reached by the majority.

EDMONDS, J.—It long has been the rule in this state that "the burden of proof is upon the one who seeks . . . restoration to the ranks of the legal profession, and before the court may grant the petition for reinstatement it must be satisfied

and fully convinced by positive evidence that the effort he has made toward rehabilitation of his character has been successful. (Citations.) It is only reasonable that the person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. In other words, in an application for reinstatement, although treated by the court as a proceeding for admission, the proof presented must be sufficient to overcome the court's former adverse judgment of applicant's character.'' (*Kepler* v. *State Bar*, 216 Cal. 52, 55 [13 P.2d 509].) This established principle has been consistently followed (*Wettlin* v. *State Bar*, 24 Cal.2d 862, 868-869 [151 P.2d 255]; *McArthur* v. *State Bar*, 28 Cal.2d 779, 788 [172 P.2d 55]; *Maggart* v. *State Bar*, 29 Cal.2d 439, 444 [175 P.2d 505]; *Beeks* v. *State Bar*, 35 Cal.2d 268, 275-276 [217 P.2d 409]), and was reaffirmed by recent decisions. (*Feinstein* v. *State Bar*, 39 Cal.2d 541, 546 [248 P.2d 3]; *Roth* v. *State Bar*, 40 Cal.2d 307, 313 [253 P.2d 969].)

The controlling criterion is whether the petitioner has produced convincing evidence of his rehabilitation, and to determine that question this court must weigh and evaluate the evidence. Essentially the determination is to be made by the application of a few general principles to the particular facts of the case.

In my opinion, the evidence presented by Werner does not meet the burden of proof required of him. The Board of Governors followed the recommendation of the Special Administrative Committee. That committee heard the witnesses and the petitioner; this court must depend upon the printed record. The determinations of the Board of Governors and its administrative committee should be accorded the greatest deference (*Roth* v. *State Bar, supra,* p. 315; *In re Lacey,* 11 Cal.2d 699, 701 [81 P.2d 935]; *Beeks* v. *State Bar, supra,* p. 277), and I do not find in the record such convincing evidence of rehabilitation as to justify a conclusion different from the recommendation made to this court.

For these reasons, I would deny the application.

Spence, J., concurred.

Respondent's petition for a rehearing was denied February 24, 1954. Edmonds, J., and Spence, J., were of the opinion that the petition should be granted.