[Civ. No. 3911.   Second Appellate District, Division Two.—September 30, 1922.]

In the Matter of the Application of W. H. STEVENS for Reinstatement as an Attorney at Law.

[1] ATTORNEY AT LAW—REINSTATEMENT TO PRACTICE—QUALIFICATIONS —INSUFFICIENCY OF PROOF. — In this proceeding for reinstatement to practice by an attorney at law who had been disbarred because of his conviction upon a charge of conspiracy to use the United States mails in a scheme to defraud, the application is denied on the insufficiency of the showing of the requisite qualifications.

APPLICATION for reinstatement to practice law. Denied.

The facts are stated in the opinion of the court.

Gates & Randles for Petitioner.

Oscar Lawler for Respondent.

WORKS, J.—The following is a chronology of the events which are principally involved in the present application: On January 10, 1911, W. H. Stevens was admitted to the bar of California, although he never engaged in the practice of law until March 1, 1912; on November 18, 1913, he was indicted by a federal grand jury upon a charge of conspiracy to use the United States mails in a scheme to defraud; on September 7, 1915, having been tried and convicted under the indictment, he was sentenced to imprisonment for six months and to pay a fine of $2,500; on June 14, 1917, he was disbarred by an order of the district court of appeal of this district because of his conviction of the charge mentioned; on December 8, 1917, he completed his term of imprisonment under the conviction and was discharged from confinement; since his discharge he has been in the employ, in various capacities, of the Los Angeles Railway Corporation, a street railway company, his service in each capacity commencing on the date specified below: February 6, 1918, as conductor; October 28, 1919, as inspector; April 1, 1920, as supervisor, apparently acting under that particular employment for

nearly a year in the office of the manager of service in the performance of special work; September 20, 1921, on special work in the main office of the company; meanwhile on October 31, 1921, he was pardoned by President Woodrow Wilson by an instrument reciting the fact of the conviction above mentioned and stating that the pardon was granted "for the purpose of restoring his civil rights"; and on March 8, 1922, his petition in the present proceeding was filed.

As petitioner was disbarred because of his conviction in the federal court of the crime with the commission of which he was there charged, it is not only proper, but it is necessary, in considering this application for his reinstatement, to examine the evidence adduced upon his trial in that tribunal; particularly as the respondent Bar Association opposes the reinstatement on the ground that the record made on the trial "shows that said Stevens is devoid of that fundamental moral perception and personal integrity to which the public and the courts are entitled on the part of every person who would pursue the practice of the legal profession."

This proceeding is of such grave import, considering its effect upon the future welfare of petitioner, upon the standing of the legal profession, and upon the rights of the general public, that we have not been content to read merely the portions of the record of the trial which were pointed out to us at the oral argument, but we have carefully and circumspectly perused the entire record in so far as it may by any possibility bear upon the question which is now of interest to us. After that labor, and also after a perusal of the portions which have been submitted to us of the record made in another trial, we state the facts as overwhelmingly established by the testimony of various witnesses, substantially corroborating each other, as against the practically unsupported statements and denials of petitioner, who, on his trial in the federal court, took the witness-stand in his own behalf:

Petitioner had been appointed a guardian *ad litem* to represent a defendant in a divorce case, the cause having been begun by the husband and the wife being a minor. Through his acquaintance with this young woman, thus commenced, petitioner, after the exercise of much diligence

in the premises, became also acquainted with three or four other girls who, like the defendant in the divorce suit, had theretofore engaged in the indiscriminate practice of sexual intercourse either for hire or for pleasure. The defendant in the divorce case and some of the other girls had been inmates of an assignation house in Los Angeles known as the Jonquil Apartments. From these girls, including his ward, petitioner procured the names of several men said by them to have been frequenters of the house. His activities in all these matters were spurred by the statement, first made to him by the ward, that several of these men, not content with the usual methods of carnal enjoyment, had indulged with the girls in certain unnatural and unmentionable sex practices. From one of the girls, however, who had not been a resident of the Jonquil, petitioner procured the name of the man asserted by her first to have made a successful attack upon her virtue in the ordinary manner. Some of the men whose names were now in the possession of petitioner were people of note in the communities in which they respectively lived. Petitioner became at once alert to get into personal touch with these men, making trips to Santa Ana, Monrovia, and El Centro for the purpose. On the journeys to the first and last-named places he was accompanied by his ward and in addition to paying his own traveling and hotel expenses he advanced hers. Not only did he go upon these quests to the places named, but petitioner called upon men in Los Angeles. Upon various of these individuals, in Los Angeles and out, he made demands for money. All but one of them refused to accede to the demands, that one paying to petitioner the sum of $2,500. Petitioner asserted at his trial in the federal court that in dealing with the men he was attempting merely to settle out of court claims which his clients had against them for damages because of the undermining of their health by the unnatural practices to which they had been subjected, except that one of the claims was for damages for the alleged rape of the girl who had not been an inmate of the Jonquil. The charge against petitioner in the federal court was based upon letters written to some of the men concerning the alleged claims against them and the jury which tried the cause refused to be-

lieve petitioner's assertion as to the innocent character of his negotiations, including in part those letters. His conviction resulted, as already recited. After reading the record which was made before the jury we cannot avoid concurring in the conclusion reached by that body. We are abundantly satisfied that petitioner studiously and deliberately embarked in an endeavor, which he pursued both diligently and relentlessly, to wrest large sums of money from these men by playing upon their fear of exposure and disgrace. It is true that he filed suits for damages against those who did not accede to his demands for a "settlement" of the alleged claims against them, but even this circumstance turns against him when it is pointed out that none of the suits was pressed and that they were all speedily dismissed.

There is yet another chapter in the story of petitioner's misdeeds. Not content with his piratical raid upon the purse of the individual through whose fears he had procured the payment of the sum of $2,500, he reported to his clients that the sum paid to him was $1,000. The truth as to this matter was not ascertained by them until long afterward.

Notwithstanding the revolting, character of the conduct of petitioner throughout this chain of events we cannot join in the view of respondent that his past misdeeds show that he still is necessarily "devoid of that fundamental moral perception and personal integrity" which should undoubtedly reside in every practitioner at the bar. To adopt that theory would be to depart not only from the teachings of human experience, but from the principles upon which are based the conduct and maintenance of the punitive and corrective institutions of mankind. It is not surpassing the bounds of truth to say that civilization itself is devoted to the view that no criminal is so steeped in his crimes, no wrongdoer is so debased, that he may not be made to feel the purifying and elevating effects of reformation and regeneration. We cannot, in so far as any judgment we might pronounce could possibly have that effect, place petitioner outside the pale thus erected. We do, however, feel the pressure of the evident truth that one who has been guilty of the acts which he has committed should not be reinstated in the ranks of the

legal profession except upon the most clear and convincing, nay, we will say upon overwhelming, proof of reform—proof which we could with confidence lay before the world in justification of a judgment again installing him in the profession which he has so flagrantly disgraced.

The statement just made has a particular application to the present case. The record of the trial in the federal court shows that extended newspaper publicity had already been given to the Jonquil Apartment affair in connection with a criminal cause recently theretofore tried in the state court. This trial was under an indictment of a prominent and wealthy man for contributing to the delinquency of one of the "Jonquil girls" who was also one of the clients of petitioner in his endeavor to collect "damages" from the men whose names he had procured in the manner above stated. We cannot go outside the record made in this proceeding, but we think we are justified in assuming that the trial of petitioner in the federal court, following upon the trial in the state court, was given as great attention in the daily press as was the latter, doubtless being regarded as an added and intriguing chapter in an already celebrated newspaper story. We have no doubt that the frailties and misdeeds of petitioner were thus thoroughly advertised to the public. We have no doubt, further, that the public, remembering the offenses of petitioner, would be shocked at his restoration to the legal profession except upon such a complete and conclusive showing of reform on his part as would convince the general mind that, if reinstated, he would discharge his every duty as a lawyer with an unswerving fidelity. Such considerations must be of controlling moment in every such proceeding as this. Not only must members of the profession be people of integrity, but the public must *know*, if possible, that they are people of integrity. Not only must the bar be entitled to the respect and confidence of the public, but it must, if possible, *actually enjoy* that respect and confidence. At least, such is the goal which every lawyer and every judge should strive to aid the profession to reach. Having these precepts in mind we could not reinstate any disbarred attorney at law if the general public could entertain any just doubt, upon the showing of reformation and regeneration made by him,

whether the standing of the profession were not lowered by his return to its ranks.

[1] With these views in mind, let us examine the showing made by petitioner in the present proceeding. We first notice a paper in the following form:

"To Whom It May Concern:

"We, the undersigned, employees of the Los Angeles Railway Corporation, and we and each of us personally knowing W. H. Stevens of Los Angeles, California, said Stevens having worked as a conductor, an inspector and a supervisor with us, have had an opportunity of observing and have observed the conduct of said W. H. Stevens. That we verily believe he is honest, industrious, conscientious and of good moral character, and we verily believe that if he were reinstated as a member of the bar of the State of California, that it would be for the best interests of all concerned."

This document bears the signatures of 601 persons, but we can see no force in it, as affecting the question now before us, except the force of numbers, and that, it must appear at once, alone amounts to nothing. Looking to the substance of the paper which has been so generously signed, we cannot see that we are to be aided by it. If we grant for the time being that there could be anything in the observed conduct of petitioner as "a conductor, an inspector and a supervisor" which would enable any single and unremitting scrutinizer of that conduct to determine from it whether he would make an honest and a reliable lawyer—a point, however, which we reserve for further mention—we cannot perceive how this array of 600 persons could have had petitioner so closely under their observation as to enable them, *en masse,* and with no showing of fact except this general statement *en masse,* to resolve that question. Recognizing the laudable willingness of the signers of the paper to help a fellow-employee out of difficulty, and with great respect for their honesty of purpose in appending their names to the document, we can ascribe no weight to the presentment made by it.

The next branch of the showing which we shall notice is made up of individual letters from various officers or employees of the Los Angeles Railway Corporation. These

agents of the company, taking their letters in the order in which they are presented to us, were the manager of transportation, the general claim agent, chief special agent, superintendent of division four, foreman of division four, superintendent of schedules, superintendent of employment, assistant chief instructor, director of public relations, director of traffic, and superintendent of operation. Aside from these communications there are before us two letters on the paper of the railway company, signed by individuals whose relationship to the corporation does not appear. It is certified in each of this parcel of letters, taking them generally, for they are couched in different terms, that petitioner's work for the company has been pursued in an honest and diligent manner and that he is one of the trusted employees of the corporation. It is somewhat difficult to determine, being guided alone by the official designations following the signatures to these letters, exactly what has been the relationship between petitioner and the various writers of them; but we shall assume that some of the letters, at least, come from those who have been his superiors, who have been in close touch with his work, and who are therefore best qualified to certify to the nature of it and to the honesty and fidelity with which it has been performed. We are thus brought directly to the question whether petitioner's several employments with the Los Angeles Railway Corporation have put him to the test necessary to purge him of the taint of his old wrongdoing and to satisfy us and the public generally that he would make a faithful and trustworthy practitioner at the bar. Are we shown that he has been tried in the fire and has not been found wanting? These questions must be answered with due regard to the nature of the offenses which resulted in his expulsion from the profession. The petitioner's employments with the railway may be set in great contrast with the position he once occupied as a lawyer and which he would reassume if he were reinstated. There is nothing in the record here to show that he has been subjected to any particular temptation while an employee of the corporation. Lawyers are continually under great temptations—temptations to which, unfortunately, they occasionally yield, as petitioner once yielded. While with the company petitioner has

always been at work under the direction, control, and supervision of others. This circumstance naturally would aid him to withstand temptation, if in truth temptation could ever have assailed him in those employments. A lawyer is his own master and encounters frequent opportunity to prey upon his clients with but little fear of detection and punishment. In his recent employments we are not shown that petitioner has handled considerable sums of money. A lawyer is often called upon to safeguard large amounts which come into his possession and often under his almost unbridled control. Petitioner in his positions with the company could never have become possessed of such an array of facts, valuable to the unprincipled mind, as he marshalled with diligence in the "Jonquil affair." Facts damaging to the peace of mind of individuals come almost daily into the hands of lawyers, and if petitioner were reinstated the natural consequence would follow that he might early in his practice become the recipient of information which could be used as he used his knowledge concerning the men alleged to have frequented the Jonquil. We need pursue the contrast no further. We cannot read in the letters of these railway officials and employees anything to show that, if petitioner were again placed in the position in which he found himself so soon after his admission to the bar, he might not again fall as far as he fell then.

The remainder of the showing made by petitioner consists of four affidavits from members of the Los Angeles bar, one from a justice of the peace of Los Angeles township, and one from a police judge in the city of Los Angeles. There is also a letter from the assistant United States attorney who conducted the prosecution of petitioner in the federal court. This letter does not show, nor does any of the affidavits show, any of the activities of petitioner except such as are incident to his various positions with the Los Angeles Railway Corporation. This part of the showing, although the papers constituting it come from those having a keener perception of the temptations to which a member of the bar is subjected than does the layman, must be placed, so far as their effect is concerned, in the same category with the branches of the showing with which we have already dealt. These lawyers and

judges give us no facts upon which we can be reasonably certain that if petitioner were reinstated he would be faithful to the sacred trust which is reposed in every attorney at law.

We cannot close this opinion without congratulating petitioner upon the standing which he has acquired with the representatives of the corporation in the employ of which he has remained for the past three years and a half, and upon the confidence with which his fellow-employees regard him. We hope he may rise yet higher in the company's line of service and that he may come to occupy yet higher posts in its employ, or in any other walks in life which he may choose to follow. Let us say, also, that such strictures as we have passed upon his character and conduct relate only to the time when he committed the acts which led to his disbarment. We do not say that he is not now qualified to be reinstated in his place at the bar. We say only that the showing made in his behalf fails to convince us that he is so qualified.

The petition is denied.

Finlayson, P. J., and Craig, J., concurred.