[Civ. No. 5485. Second Appellate District, Division Two.—August 15, 1927.]

In the Matter of the Petition of ALFRED J. MORGAN-STERN for Reinstatement.

Alfred J. Morganstern, *in pro. per.*, and Curtis Hillyer for Petitioner.

Wirt Francis and Eugene Daney, Jr., for Respondent.

WORKS, P. J.—Petitioner was admitted to the bar of California in 1889. He took up his residence in San Diego in 1908 and engaged in a lucrative law practice in that city from that time to the period of his disbarment. The judg-

ment which thrust him from the profession was entered January 9, 1922, pursuant to an accusation which was filed September 6, 1921. The grounds of the accusation are stated in the opinion *In re Morganstern*, 61 Cal. App. 702 [215 Pac. 721], in which the judgment of disbarment was affirmed upon appeal.

Petitioner's application in the present proceeding was filed October 2, 1926. Thereafter, and following the filing of an answer to the petition by respondent San Diego Bar Association, the matter was sent to referees for the taking of evidence and for findings upon the questions whether petitioner is possessed of both the mental and moral qualifications entitling him to re-admission to the bar. The referees took evidence, as directed, and have filed their findings. ■ One of the findings is to the effect that there is such doubt as to petitioner's mental qualifications as to render necessary an examination to test them. To this finding one of the three referees entered his dissent. The written exception of petitioner to the finding has been interposed.

Upon the score of petitioner's mental qualifications we shall refer to the testimony, given before the referees, of several of those who were the associates of petitioner as fellow practitioners at the bar of San Diego before his disbarment. One of these said: "I have not seen him in court this last year, but speaking to him and seeing him personally I see no difference in his mental attitude now and what it was when he was practicing law. . . . He is very acute; he is a good lawyer; he is a good trial lawyer. . . . [I believe] he has the ability to perform the duties of an attorney-at-law in an efficient and able manner . . . " Another lawyer testified: "Q. Have you had an opportunity to judge of his mental and legal attainments? A. Well, I have always regarded Mr. Morganstern as a very brilliant man, a man with a wonderful mind and a man of some attainments, and as I said, I regard him as rather brilliant. . . . [U]nless he has deteriorated since he has been disbarred I regarded him as competent then, and I have no reason to change my opinion. . . . I have seen him and I have not seen any evidence of deterioration. . . . I say if he has abandoned [certain habits which will be referred to later in this opinion] he certainly has the ability; he is

brilliant; he is learned; he is shrewd and competent in every way." Another testified: "Q. In your opinion he has the ability and requisite degree of facility with which to enable him to practice law with credit? A. I should say so far as his mental attainments and legal attainments are concerned that he had, yes. Q. He has at the present time? A. Yes, sir." Another lawyer said: "Mr. Morganstern possesses a mentality that is considered by many unequalled at least in this city, and not surpassed by many men at the bar anywhere. . . . [H]e is so considered by the bar. . . . Q. And that is your opinion too? A. From my own experience with him, from hearing him discuss cases, hearing him argue cases, my knowledge of his briefs, that is my opinion. Q. Have you talked with him or seen him . . . the past year? A. Oh, yes, naturally. Q. Have you seen any signs of mental deterioration? A. No. . . . " Yet another member of the bar said: "I regard Mr. Morganstern as one of the very best attorneys I have ever known in my life, either here or where I practiced before, both as a consultationist, as a jury lawyer or as a court lawyer. He has the finest legal memory of any lawyer I ever met and equalled only by one other lawyer I think that I have met. . . . " Finally, yet another lawyer testified: "His legal qualifications I would say are the best. Q. How about his mental? A. Of the best."

No evidence was offered in contradiction of these flattering testimonials. Further, at the oral argument before us in the present proceeding the counsel for respondent Bar Association conceded petitioner's mental attributes and remarked that in his view the proceeding must turn upon the question of petitioner's moral qualifications. We can understand the finding of the majority of the referees only upon the theory that they viewed the question of petitioner's moral attributes as affecting his mental qualifications. In a broad and general sense, of course, the morals of an individual, if bad, will affect the question of his mental attainments; but in a proceeding like the present the two attributes are to be regarded as separate and distinct each from the other.

We regard petitioner as one of those—following the language of the supreme court—"concerning whose grasp of the law there is no question" (*In re Stevens*, 197 Cal. 408

[241 Pac. 88]). The finding which expresses a doubt as to his mental qualifications cannot stand.

We turn now to the controlling branch of the proceeding. The referees all joined in a finding that petitioner "does not possess the moral qualifications required to be possessed by a person exercising the office of an attorney and counsellor at law." Petitioner takes written exception to the finding.

While petitioner was disbarred because of the commission of the certain specific acts charged in the accusation against him, it is practically conceded that his delinquencies were accountable to and arose from his inordinate passion for gambling. In this proceeding petitioner himself has frankly testified: "Q. Reference has been made in cross-examination of some of these witnesses to your reputation here with regard to visiting the race track and gambling and issuing checks. A. All quite true. I know of nothing in the way of amusement that I am as fond of as a horse race. I know of nothing, that is I know of no man who has had a greater obsession for gambling than I did; no matter what my earnings were, at the end of the year I was in debt. I cannot remember a single year that I did not owe some bank money at the end of the year. . . . I want to say . . . that there never was an irregularity in my life, never an unhappiness in my life that was not traceable directly to [gambling] . . . I was on one occasion, and it was told of me around here with a good deal of gusto, I went to Tia Juana many years ago and lost a great deal of money playing faro bank. I had a dollar or two left and sat down and played a game called pangingi where the stakes were five cents, and they tell me that I spent the remainder of the night playing that game after losing thousands of dollars. In other words, it was the passion of playing. . . ." In one place in his testimony petitioner said, with a context showing that he intended to apply the observation to himself: "I don't know whether you understand from observation, what is meant by a card drunkard."

We are to inquire here, then, not whether, since his disbarment, petitioner has refrained from the commission of acts similar to those which led to the judgment removing the ermine of the profession from him, but whether his

passion for gambling has been put under foot. Upon this broad issue must the present proceeding be determined.

Certain principles affecting the question before us, under the testimony developed before the referees, have been laid down in the decided cases. One who has been disbarred for acts involving a high degree of moral turpitude—and those committed by petitioner were of that character—"should not be reinstated in the ranks of the legal profession except upon the most clear and convincing, nay, we will say upon overwhelming, proof of reform—proof which we could with confidence lay before the world in justification of a judgment again installing him in the profession . . . " (*In re Cate,* 60 Cal. App. 279 [212 Pac. 694].) When an attorney has been disbarred his re-admission to the profession "should only come when he has lived long enough after his disbarment in honorable intercourse with his fellow-citizens to demonstrate that he is both tried and true" (*In re Shepard,* 35 Cal. App. 492 [170 Pac. 442]). The element of time necessarily is to be considered in determining whether evidence of reform is sufficient to entitle an applicant to re-admission under the language of the first of these quotations, and it is specifically contemplated by the language of the second. It is to this element of time that we now propose to address ourselves.

Petitioner's application for re-admission was filed a little less than four years and nine months after the judgment of disbarment which was pronounced against him. Soon after the judgment was rendered he went to Europe, after consultation with certain officers of the United States government at Washington, upon a mission to European governments, which was highly creditable to him and which brought him in touch with prominent officials of foreign countries. After spending some considerable time abroad he returned to the eastern part of the United States and, after conferences there, again went to Europe. He did not return to California until eleven months before the filing of his petition for re-admission to the bar. These circumstances, to our minds, exert a controlling influence over the disposition of petitioner's application. He testified before the referees, it is true, that he has overcome his passion for gambling, and he pledged himself in the most solemn manner never to engage in the practice again. We are not under the slight-

est impulsion to discredit his asservations in these respects. On the other hand, we yield to them full credit. As far as we may judge from the typewritten pages, his attitude is marked by the highest degree of sincerity, his mind is colored by the healthful influence of a high resolve. He undoubtedly believes that his reform is permanent. If his rights alone were involved we should not hesitate to order his re-admission. We confess a feeling of deep sympathy for this mind which has emerged from turmoil into a sense of triumph. The promptings of charity forbid us wantonly to utter a word which may change this feeling to one of discouragement or despair. The public interest in the issue of this proceeding, however, is paramount to every consideration looking alone to the fate of petitioner. Under all the circumstances shown by the record we cannot yet confide in a conclusion that petitioner's reform is complete and final, and it would be unfair to the public interest to order a re-admission except upon a feeling, bordering upon conviction, that he has forever put under foot the temptations of the past.

The shortness of petitioner's actual residence in California since his disbarment materially affects the conclusion which we shall reach. He has not been long enough in the state— the scene of his old temptations—to satisfy us that he has finally risen above the old practices and to make us join in the feeling of confidence which so thoroughly imbues him. He has not been here long enough to prove himself among those to whom, as the record shows, extreme publicity of his former habits was given—those who with diligence and sometimes with venom will be scrutinizing his every act. For these reasons, and for these alone, we think the finding of the referees as to lack of moral qualifications must be upheld.

The finding of the referee which expresses a doubt as to petitioner's mental qualifications is set aside. The finding that he lacks moral qualifications is adopted as the finding of the court. The petition for re-admission to the bar is denied.

Craig, J., and Thompson, J., concurred.