[L. A. No. 22129.   In Bank.   Sept. 16, 1952.]

LOUIS FEINSTEIN, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

542

J. H. Morris for Petitioner.

Robert H. Edwards, Jr., and Jerold E. Weil for Respondent.

THE COURT.—In 1938, upon conviction of a felony, Louis Feinstein was disbarred. (Bar Misc. No. 1527.) The Board of Governors of The State Bar upheld the action of an administrative committee unanimously recommending the denial of his petition for reinstatement. The matter is before this court upon Feinstein's petition to review the board's action. (Rules on Original Proceedings in Reviewing Courts, rule 59[b].)

Feinstein was admitted to practice in California in 1927. He was convicted upon each of two counts of an indictment which charged him with soliciting a client to commit grand theft. (Pen. Code, § 653f.) The judgment of conviction was affirmed (*People* v. *Humphrey,* 27 Cal.App.2d 631 [81 P.2d

588]) and he was automatically disbarred. (Code Civ. Proc., § 299; now Bus. & Prof. Code, § 6102.)

Concurrently with the criminal action, disciplinary proceedings against Feinstein were pending before a local administrative committee of The State Bar upon charges of issuing and passing fictitious checks. The committee unanimously recommended his disbarment and the Board of Governors approved the recommendation. (Bar Misc. No. 1541.) Feinstein's petition to this court for a review of those proceedings was dismissed as having become moot because of the previous order of disbarment based upon his conviction in the criminal proceeding. (*Feinstein* v. *State Bar*, 12 Cal.2d 461 [85 P.2d 869]; *Hall* v. *State Bar*, 12 Cal.2d 462 [85 P.2d 870].)

Following his conviction, Feinstein was imprisoned until his release on parole in 1940. Upon his release, he secured employment as a salesman and bookkeeper and later entered business for himself as a public accountant, which profession he has followed to the present time. In 1950, Feinstein was granted a full and unconditional pardon by the Governor in accordance with the provisions of sections 4852.01 through 4852.2 of the Penal Code.

At the hearings upon his petition for reinstatement before the local administrative committee, Feinstein produced 13 witnesses who testified to his good moral character, diligence, and faithful performance of his work. Nine of these witnesses had employed him for varying periods since his release from prison. Three of them did not know that he had been disbarred. The other six knew, or surmised, that he had been disbarred, but did not know the facts concerning his difficulties.

All of the witnesses who had employed him were satisfied with his work and had confidence in him, although only one of them had ever had occasion to entrust him with any money. Several who testified in his behalf indicated that they would not hesitate to employ him in a capacity of trust or confidence should the occasion ever arise. The record includes testimony by persons who know Feinstein and his family socially. They said that his family relationships were excellent. Upon the request of Feinstein's counsel, the examiner was prohibited from informing any of the witnesses who had employed him of the details of Feinstein's disbarment or questioning them as to whether such knowledge would alter their opinions of him.

The remaining four witnesses, three of whom are attorneys, knew the details of Feinstein's disbarment. An optometrist and two of the attorneys were personal friends of Feinstein, but their contact with him since his parole was social only. They rated Feinstein as having a high moral character before as well as after his conviction. Their opinions that he now is morally fit to practice law were based upon circumstances no different from those existing before he was disbarred.

J. H. Morris, Feinstein's brother-in-law and his counsel in this proceeding, testified that, in a discussion pertaining to his reinstatement, Feinstein denied ever having made the fraudulent suggestions attributed to him in the criminal prosecution which resulted in his disbarment. Feinstein's explanation of the bad check accusations, as related by Morris, was that he had given the checks "sort of foolishly, without realizing what he was doing." Morris believes Feinstein's statement that he was not guilty of the charge of which he was convicted and said he would have the same opinion of Feinstein's high moral qualifications to practice law irrespective of this belief. Other than the present proceeding, Morris has had no professional dealings with Feinstein. He knew of no instance when Feinstein had been placed in a confidential relationship which might have tempted him to depart from an ethical course of conduct.

Testifying on his own behalf, Feinstein admitted the issuance of fictitious checks without sufficient funds to cover them as charged in the disbarment proceeding. He also stated that he knew his associate, Hall, was issuing similar checks. He drew a line through the word "order" on the checks, he said, to destroy their negotiability and give notice to third parties that it was an "unusual transaction." According to Feinstein, "it seemed to be held against me instead of for me. I thought I was doing the right thing, and instead I was doing the wrong thing. I shouldn't have done anything like that at all."

According to Feinstein's testimony, he drew the checks to assist a client who was operating a night club. "I don't think I collected more than a few hundred dollars at the time this thing happened," he said. "It was contemplated the more successful the night club was, the more work I did, and the more money I would make, but he wasn't any large client. It was a few hundred dollars involved, I guess."

As stated by Feinstein to the committee, the bank's president informed him at the time of the disbarment proceeding

that the bank had lost nothing and that he did not believe Feinstein knew anything about the conspiracy to defraud it. Feinstein has never made restitution to the bank for losses occurring as the result of the check transactions, nor undertaken any further inquiry as to whether there were losses.

At the hearing upon his application for reinstatement, Feinstein flatly denied any guilt in connection with the fraudulent suits which were the basis for the criminal charges which resulted in his conviction. He said: "These cases were cases of clients of mine where they admitted that they had participated in a fake accident case. They testified against me and the doctor. They were given complete immunity as a result of it . . . it was either their skin or the skin of the doctor and the lawyer." Later, he remarked: "I never knew that either Callie Elliott or anybody else had been in a fraudulent claim." Feinstein stated that he had never inquired as to whether any loss had resulted to the defendants from the filing of suits in the negligence actions, nor had he repaid any portion of the settlement received in one of those cases.

Feinstein's income tax returns, admitted into evidence, indicate that his income has steadily increased from approximately $4,500 in 1943 to about $13,000 in 1949. His 1950 income was $13,000.

Regarding his legal ability, Feinstein testified that he read advance sheets of an accountant's tax service from time to time, had subscribed to the Southern California Law Review and read a tax magazine containing comments on tax law. One of the attorneys who had discussed hypothetical legal problems with him found that he had a keen conception of the applicable principles. Another attorney stated that he and Feinstein had discussed questions of law common to tax matters from time to time.

Upon the foregoing evidence and the exhibits introduced, including the documents in connection with the statutory rehabilitation proceeding, the administrative committee unanimously concluded that Feinstein has not fully rehabilitated himself, lacks the present moral qualifications to warrant his reinstatement, and does not have present ability and learning in the law sufficient to warrant his reinstatement. These conclusions were adopted by the Board of Governors.

Feinstein contends that the evidence does not support certain findings of the committee or the conclusions and

recommendations of the committee and the board. The evidence, he says, conclusively establishes his rehabilitation and present good moral character. Concerning his legal ability at this time, he offers to take an examination if ordered to do so. The State Bar argues that Feinstein failed to meet his burden of proving, by clear and convincing evidence, that he is entitled to reinstatement.

Reduced to its basic essentials, Feinstein's argument is that the evidence which he produced of his present good moral character was undisputed. The State Bar, he says, offered nothing to overcome this showing and relied solely upon the offenses which led to his disbarment. It is his contention that undue weight has been given to his past misconduct in reaching the conclusion that he has not been rehabilitated. Throughout this proceeding, both in his testimony before the committee and in his argument to this court, Feinstein has contended that he never intentionally did any wrong and that the testimony against him in the criminal case is suspect.

"The sole object of the court, upon an application by an attorney previously disbarred for reinstatement to practice, is to determine whether or not the character of the applicant is such that he should be admitted to an office of trust, and recommended to the public as a trustworthy person, fit to be consulted by others in matters of confidence. (Citation.) In such proceeding the burden of proof is upon the one who seeks, after disbarment, to accomplish a restoration to the ranks of the legal profession, and before the court may grant the petition for reinstatement it must be satisfied and fully convinced by positive evidence that the effort he has made toward rehabilitation of his character has been successful. (Citations.) It is only reasonable that the person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. In other words, in an application for reinstatement, although treated by the court as a proceeding for admission, the proof presented must be sufficient to overcome the court's former adverse judgment of applicant's character." (*Kepler* v. *State Bar*, 216 Cal. 52, 55 [13 P.2d 50]; *Beeks* v. *State Bar of California*, 35 Cal.2d 268, 275 [217 P.2d 409]; *McArthur* v. *State Bar*, 28 Cal.2d 779, 788 [172 P.2d 55].)

"One who has been disbarred for acts involving a high degree of moral turpitude—and those committed by

petitioner were of that character—'should not be reinstated in the ranks of the legal profession except upon the most clear and convincing, nay, we will say upon overwhelming, proof of reform—proof which we could with confidence lay before the world in justification of a judgment again installing him in the profession. . . .' " (*In re Morganstern,* 85 Cal.App. 113, 117 [259 P. 90]; *Wettlin* v. *State Bar,* 24 Cal.2d 862, 869 [151 P.2d 255]; *In re Stevens,* 59 Cal.App. 251, 254-255 [210 P. 442].)

■ "It has been definitely determined by this court that a pardon of an attorney previously disbarred on account of his conviction of the offense of which he was subsequently pardoned does not of itself reinvest him with those essentials required of an attorney at law." (*Wettlin* v. *State Bar, supra; In re Lavine,* 2 Cal.2d 324, 329 [41 P.2d 161, 42 P.2d 311].) ■ The finding of the certificate of rehabilitation (Pen. Code, § 4852.13) that Feinstein is now of good moral character is not one that he presently possesses the highest moral qualities required of an attorney., nor is it binding upon The State Bar or this court. (Pen. Code, § 4852.15.) At most, it is but evidence to be considered together with other evidence of his present qualifications to practice law. (*In re Lavine, supra.*)

■ Letters of recommendation and the favorable testimony of witnesses, especially that of employers and attorneys, are entitled to considerable weight. (*Preston* v. *State Bar,* 28 Cal.2d 643, 650-651 [171 P.2d 435]; *In re Andreani,* 14 Cal.2d 736, 749-750 [97 P.2d 456].) But such evidence, however laudatory or great in quantity, is not alone conclusive. (*Wettlin* v. *State Bar, supra; Kepler* v. *State Bar, supra,* p. 56.) ■ Reformation is a "state of mind" (*In re Andreani, supra,* p. 749) and "the applicant must show a proper attitude of mind regarding his offense before he can hope for reinstatement." (*Wettlin* v. *State Bar, supra,* p. 870.) The committee of The State Bar, which has an opportunity to view the witnesses and the petitioner, is in a better position than is the reviewing court, faced only with the cold printed record, to determine the applicant's state of mind. (*In re Andreani, supra,* p. 750; *Vaughan* v. *State Bar,* 208 Cal. 740-745 [284 P. 909].) ■ Although this court has plenary power to reinstate an applicant previously disbarred, it has always accorded the greater deference to the recommendation of The State Bar and its administrative committee. (*In re Lacey,* 11 Cal.2d 699, 701 [81 P.2d 935].)

Only where the record clearly and convincingly demonstrates that the applicant possesses an acceptable appreciation of the duties and responsibilities of an attorney at law in relation to his clients and the courts may a decision overruling the unfavorable action of the Board of Governors be justified. (*Beeks* v. *State Bar of California, supra*, p. 277.)

The record here fails to meet the requirement of clear and convincing proof of reform. The pardon and the favorable testimony of witnesses show commendable progress by Feinstein in rehabilitating himself as a member of society, but such improvement does not compel the conclusion that he now has the highest moral attributes required of an attorney. To the contrary, his repeated assertions that, despite his conviction and the other disciplinary proceedings against him, he committed no wrong, coupled with his failure to make any attempt since his parole either to determine whether his activities resulted in losses to others or to reimburse his victims, indicate a continuing failure to comprehend his professional responsibilities. Under some circumstances, ''a spirit of willingness, earnestness and sincerity'' is sufficient to permit reinstatement although it is not within the power of the applicant to undo the damage which his acts have caused to others. (*In re Andreani, supra*, p. 750; *Preston* v. *State Bar, supra*, p. 650.) But Feinstein has shown no such spirit, although it has been within his power not only to determine what damage he had caused but to right at least some of his wrongs.

There is nothing in the record which would justify this court in ordering either immediate reinstatment or acceptance of Feinstein as an applicant for examination upon his technical qualifications.

The application of petitioner for reinstatement is denied.

CARTER, J.—I dissent.

Upon a record which conclusively establishes the right of petitioner to be reinstated, the majority holds that reinstatement is not permissible because petitioner still protests his innocence of the felony, the conviction upon which he was disbarred, and because he has not restored money said to have been improperly obtained by him. As will be shown, there was nothing obtained by petitioner and hence there is nothing for him to restore. If lack of penitence is shown by clinging to one's honest assertion of innocence, then innocence is a crime rather than a virtue. If petitioner has not now shown that he is rehabilitated, he never will be able to

do so. In the face of a record which conclusively establishes rehabilitation, the majority arbitrarily says to him: "You must give up all hope of regaining your former position as a member of the bar." Let us look at the facts.

First it was found that prior to the time of petitioner's disbarment, disciplinary proceedings were pending against him before the Board of Governors and the board had recommended disbarment. Petitioner's petition to this court for a review of those proceedings was dismissed by this court because of the disbarment by reason of his conviction of a felony on a different charge. (*Feinstein* v. *State Bar,* 12 Cal.2d 461 [85 P.2d 869].) Thus no review of those proceedings has been had by this court and they have no bearing on the instant case. The charge in those proceedings arose out of the issuing and passing of two fictitious checks of $475 each, and eleven checks totalling $4,200. According to the findings in those proceedings, petitioner had as a client a Mr. Zimmer who controlled a corporation which owned a café. For his legal services to the corporation and past loans, petitioner was to receive 25 per cent of the profits of the business; later changed to fixed weekly installments. Zimmer was short of capital and had an arrangement with tellers of a Hollywood bank permitting him to overdraw his and the corporation's accounts, which eventually led to a loss by the bank of $20,000. Zimmer told petitioner of the arrangement and asked him to loan him checks drawn on his account in the same bank and Zimmer would cover them with cash deposits to petitioner's account from café receipts; some checks were to be sold to a third person. The arrangement was carried out by petitioner who gave checks which he had rendered nonnegotiable by drawing a line through the word "order." This would not ordinarily be observed. The Zimmer affair resulted in his being indicted by a federal grand jury *but the proceeding was dismissed. It also appears that the president of the bank told petitioner that he was not liable, as he did not know of the deal between Zimmer and the bank tellers.* Hence, even if we give consideration to the Zimmer transactions, petitioner was under no obligation to refund anything to the bank. He received nothing and we have the bank president's word that nothing was owing.

In addition to the foregoing facts, the committee also found that since petitioner's release from prison in 1940 he has operated the business of public accountant, having obtained a certificate in 1945 from the state board to do so. In addi-

tion to his own testimony he produced 13 witnesses, three of whom were attorneys, one an optometrist and the others persons who had employed him as a bookkeeper. Those for whom he kept books testified that he faithfully discharged his duties, and in one case that he had been entrusted with substantial sums of money and faithfully accounted for his trust. Some of those witnesses said he had not handled matters for them involving a trust or confidential relationship. One attorney testified that he was rehabilitated and knew the law, but his only relationship with him consisted of discussions of his own cases. Another, a relative, said he had been rehabilitated. As to his legal ability, he testified that he read advance sheets of accountant's tax service from time to time, received the Southern California Law Review and read a tax magazine containing comments on tax law. The committee concluded by finding that petitioner had failed to sustain the burden of proving that he had rehabilitated himself, or had the moral qualifications, or had sufficient learning or ability in the law.

The recommendation of the board is based *solely* upon the conduct of petitioner between 1935 and 1937, and the asserted failure of petitioner to prove his rehabilitation. *No other evidence was offered by it.* On the other hand, petitioner produced testimony by *nine* witnesses engaged in various businesses who have *employed him as tax consultant, accountant and bookkeeper for periods ranging from five to eleven years.* They *all* testified that his work was accurate and satisfactory. Various remarks were made to the effect that his character is "above reproach"; that "if he conducts himself as well as an attorney as he does as an accountant he would make a very good attorney"; that he is honest in all respects, trustworthy and highly honorable; that: "I would not be afraid to trust the man with the entire store and let him take care of it. I trust him fully, he is a trustworthy person." While only one witness testified that he had entrusted him with his funds, others said they would be willing to do so if there were any occasion for it. Some witnesses testified that they had not employed him in a confidential capacity, and apparently they had no occasion to do so, but if they had, they would not hesitate to engage him for such work. Some of the witnesses knew and some did not know he had been disbarred in 1938, but some of those without that knowledge said *it would have made no difference in their testimony.*

Three attorneys practicing in Los Angeles testified for petitioner. One who had known him for 26 years and was associated with him for a short time, knew of the disbarment and talked to him about it, testified that he now has a good sense of morality, has proven himself to be of good moral character and fit to practice law. Another testified to substantially the same effect. Counsel for petitioner in this proceeding, a brother-in-law of petitioner, testified that he has known petitioner since 1944; has had discussions on legal questions with him and found him understanding of them; that petitioner is morally rehabilitated. An optometrist, who had been a friend for 15 years, stated that petitioner had a good reputation for honesty.

Petitioner testified at length regarding his activities both before and after disbarment in which he denied any wrongdoing in the Zimmer matter; that he did not make restitution to the bank or anyone else because no money was received by him and he did not incur any liability or indebtedness. He made special studies in accounting in prison and thereafter, but none in law.

It is the position of respondent that the burden was on petitioner to show that he had become rehabilitated, is now of good moral character and learned in the law (see *Beeks* v. *State Bar of California,* 35 Cal.2d 268 [217 P.2d 409]; Rules of Procedure of The State Bar, rule 52); that the past conduct of petitioner discloses a mental attitude of a person who would commit a wrong when placed in a position of trust and confidence if he thought he could escape retribution.

In respect to the latter contention it would seem more accurate to describe petitioner's mental attitude to be that of an attorney who would use his office to obtain wrongfully something from third persons with whom he did not occupy a position of confidence, as the crime of which he was convicted, or which, like the Zimmer affair, did not involve the defrauding of his client but the gaining of something from someone else for his client and himself. And he has conclusively proven by the many witnesses above mentioned that he is not now the kind of a person who would attempt to obtain money from others by fraud. Indeed it has been held that the conduct leading to the prior disbarment is too remote to be considered on application for reinstatement (*In re Stoller,* 160 Fla. 769 [36 So.2d 443]), and the essential question is whether he has reformed and his moral stability has been restored. It must be remembered that prior to the

incidents above mentioned, which occurred between 1935 and 1937, he had not been involved in any difficulty and his good moral character was established when he was admitted to the bar.

Moral reformation or rehabilitation has long been a perplexing problem to such experts as penologists, psychologists, theologians and social workers. When laymen endeavor to ascertain the fact on the evidence of lay witnesses, the problem becomes even more complex. It is very difficult for an attorney seeking reinstatement to produce witnesses who have sufficient intimate knowledge of his conduct both before and after his disbarment to give an opinion as to whether the applicant has been fully rehabilitated. In most cases, witnesses available to the applicant are those who, because of their association with him after his disbarment, can testify that he *then*, at the time of the hearing, has a good moral character—a reputation for that character. This evidence is pertinent because a strong inference flows from his continuous good character since disbarment that he will not again resort to practices which might bring him into disrepute. To weigh against that evidence the nature of his misconduct and conclude that he has not been rehabilitated, is to reject such testimony and the inference which flows therefrom. It verges on reaching a conclusion that some misconduct may be considered so reprehensible that reformation is impossible. If it does not go that far, the decision of the arbiter becomes mere speculation, because he is required to weigh the seriousness of the wrong committed against positive evidence that the person now has a good character, the effect of the former factor on possibility of reformation being a mere matter of personal opinion which the applicant is helpless to supply evidence to rebut. The gravity of the offense should not, therefore, be of compelling consequence. The character or nature of the misconduct is of importance however, that is, what was done under what circumstances. It is then possible for the applicant to present evidence by acquaintances that under circumstances of a similar character generally he has properly conducted himself—has not fallen into a similar pattern of wrongdoing. Of course, the length of time that applicant has kept himself on the side of rectitude is important, for it may be inferred that the longer he has been honest, the more likely he will stay that way. In this connection, the majority opinion suggests that the testimony of petitioner's witnesses shows that

it was not based on circumstances different from those existing before disbarment; they thought he was honest before and still think he is. That is not true of all of the witnesses and does not erase the positive, unrefuted evidence that petitioner is now of good moral character.

In the instant case petitioner has produced such evidence. He has shown generally, without dispute, that he now has a good moral character. While some of his witnesses said they had not employed petitioner in a confidential capacity, others had, and it should be clear that where one employs another to keep his books and prepare his tax returns, the employer is placing all the facts relating to his business in the employee's hands, a thing he would not do if he did not trust the employee. In tax return work, applicant had an opportunity to defraud the government to his employer's direct benefit and his own incidental benefit, but did not do so. If he had, it would be a pattern of misconduct similar to that in which he indulged between 1935 and 1937. Neither the committee nor the board found that they disbelieved petitioner's witnesses. Over 12 years have elapsed since the disbarment. If that cannot be considered sufficient time, then most of our parole proceedings and penalties for various offenses lack a sound foundation.

Furthermore, it will be recalled that petitioner was granted a full and unconditional pardon by the Governor. While it has been held that a pardon does not restore to a disbarred attorney the right to practice law (*Wettlin* v. *State Bar*, 24 Cal.2d 862 [151 P.2d 255] ; *In re Lavine*, 2 Cal.2d 324 [41 P.2d 161, 42 P.2d 311]), it is clear that great weight must be given to pardons such as the one here involved. The pardon granted petitioner was pursuant to provisions added to the Penal Code in 1943. (Pen. Code, §§ 4852.01-4852.2.) Thereunder a released prisoner may file with the superior court of the county in which he resides a notice of intention to apply for a "certificate of *rehabilitation.*" (Pen. Code, § 4852.01.) "During the period of rehabilitation the person shall live an *honest and upright life,* shall conduct himself with sobriety and industry, shall *exhibit a good moral character,* and shall conform to and obey the laws of the land." (Emphasis added.) (*Id.,* § 4852.05.) After the period for rehabilitation has expired he may apply to the court for a "declaration of the *fact* of his rehabilitation"—for a "certificate of rehabilitation." (*Id.,* § 4852.06.) Notice is given of the application to the district attorney, chief of police and Governor. (*Id.,* § 4852.07.)

A hearing is had in which is considered testimony and "all records and reports relating to the petitioner and the crime of which he was convicted, including the record of the trial, the report of the probation officer, if any, the records of the prison from which the petitioner has been released showing his conduct during the time he was there imprisoned, the records of the prison doctor and the prison psychiatrist, the records of the parole officer concerning him if he was released on parole, the records of the Youth Correction Authority concerning him if he has been committed to the authority, the records of the chief of police or sheriff upon whom the notice of intention was served, and written reports or records of any other law enforcement agency concerning the conduct of the petitioner since his release on parole or discharge from custody." (*Id.*, § 4852.1.) Moreover, the court "shall require from the district attorney an investigation of the residence of the petitioner, the criminal record of the petitioner as shown by the records of the Bureau of Criminal Identification and Investigation, and the investigation of any representation made to the court by the applicant, and the district attorney shall file with the court a full and complete report of the results of said investigations, and shall require from the district attorney and the chief of police or sheriff having jurisdiction as provided in subdivision (a) of Section 4852.02 written reports setting forth all matters within their knowledge relating to the conduct of the petitioner during his period of rehabilitation, including all matters mentioned in Section 4852.11." (*Id.*, § 4852.12.) (It should be noted that many more sources are used to determine rehabilitation than are customarily available in reinstatement proceedings before The State Bar.) If the court after the hearing "finds that the petitioner has demonstrated by his course of conduct *his rehabilitation and his fitness to exercise all of the civil and political rights* of citizenship, the court shall make an order declaring that the petitioner has been rehabilitated and recommending that the Governor grant a full pardon to the petitioner." (Emphasis added.) (*Id.*, § 4852.13.) Thus, the precise fact, moral rehabilitation and whether petitioner has exhibited a good moral character, decided by the court, is presented to The State Bar on application for reinstatement. It was observed by this court, with respect to the use of a transcript of testimony at a criminal trial in a disbarment proceeding: "Petitioner was prosecuted in the name of the People of California, and the trial was

conducted by attorneys representing the People. In the present proceeding the case against petitioner is presented by The State Bar, acting as the arm of this court and also representing the People of the State. In reality the parties are the same. Petitioner's contention that the subject matter is not the same is based on the fact that this proceeding is for disbarment, whereas the earlier case was a criminal prosecution. The Legislature, however, aware that a disbarment proceeding is different from any other type of action, could hardly have intended to preclude the use of the transcript of an earlier proceeding in a proceeding for disbarment. The State Bar seeks to prove the same facts that the public prosecutor sought to prove so that both proceedings actually do concern the same matter.'' (*Werner* v. *State Bar,* 24 Cal.2d 611, 616 [150 P.2d 892].) It cannot be doubted, therefore, that petitioner's certificate of rehabilitation is a very cogent factor. It is not like an ordinary pardon where the motive or basis may be merely sympathy or forgiveness.

A point is made of the failure of petitioner to make restitution. This is not a case of misuse of a client's funds and here it does not appear that petitioner received anything or that anyone was entitled to or claimed a right to the restoration of anything.

Respondent claims a lack of showing of legal ability to practice. As above shown, there is evidence that petitioner has such ability. Moreover, he is a college graduate, a graduate of a law school of high standing, and practiced law for over ten years. It will not be presumed he has lost his knowledge. The presumption is the other way. (See *Friday* v. *State Bar,* 23 Cal.2d 501 [144 P.2d 564].) Moreover, petitioner offers to take a legal examination if this court deems it necessary.

From the foregoing it is apparent that the only just and and reasonable result is reinstatement. The basis of the majority opinion seems to be that petitioner has not made a lachrymose display of penitence, or come to the Throne of Grace humbly begging forgiveness for sins he claims not to have committed. Not only that, but he must apparently produce witnesses who have heard him shout from the rooftops that he was a sinner but has forsaken his sins and is now redeemed. The majority seems to have forgotten that deeds speak louder than self-serving protestations. By the record petitioner has conclusively demonstrated that his conduct since disbarment has established rehabilitation. Nothing more should be required under any system which has for its

objective the accomplishment of the American ideal of ''Equal justice under law.''

I would reinstate petitioner as a member of the bar.

Petitioner's application for a rehearing was denied October 9, 1952. Carter, J., was of the opinion that the petition should be granted.