[L. A. No. 22278.   In Bank.   Feb. 25, 1953.]

IRWIN HARRY ROTH, Petitioner, v. THE STATE BAR, Respondent.

John W. Preston for Petitioner.

Neil G. Locke and Jerold E. Weil for Respondent.

THE COURT.—Irwin Harry Roth was disbarred in 1942 upon conviction of a felony. (Bar Misc. No. 1745.) In 1950, he petitioned for reinstatement. An administrative committee of The State Bar unanimously recommended that his petition for reinstatement be denied. The matter is before this court upon Roth's petition to review the order of the Board of Governors upholding that determination. (Rules on Original Proceedings in Reviewing Courts, rule 59[b].)

Roth first was admitted to practice in Missouri. In 1931, following three years of practice in Missouri, he was admitted to the California bar without examination.

About three years later, Roth was adjudged in contempt of court for alleged volations of court orders restricting the withdrawal and use of funds recovered as damages by minors in personal injury actions in which they had been represented by him. Because of the insufficiency of the affidavits by which the contempt proceedings were instituted, he was released upon a writ of habeas corpus. (*In re Roth,* 3 Cal.App.2d 226 [39 P.2d 490].) In a concurring opinion, one justice suggested that "the facts show a scandalous manipulation of funds awarded by the court for the benefit of minors. Whether or not petitioner was involved in such manipulation, I do not intimate. It would seem, however, that the facts would admit

of positive allegations should The State Bar be advised to take further action.'' (P. 237.)

Acting upon this suggestion, The State Bar instituted disciplinary proceedings against Roth, charging him with violation of court orders and misappropriation of funds of· clients. (L. A. No. 798.) Upon the recommendation of its administrative committee, the Board of Governors dismissed the proceeding for insufficiency of the evidence to support the charges.

In 1937, Roth was suspended from practice for a period of six months by order of this court for violations of the Rules of Professional Conduct by the solicitation of employment. (*Roth* v. *State Bar*, 8 Cal.2d 656 [67 P.2d 337].) In that proceeding, only two specific cases were under investigation. However, the court said: ''The further fact should be mentioned that petitioner's conduct in other cases has been the subject of investigation and that he has been employed in other cases under suspicious circumstances.

''We entertain no doubt that petitioner has been soliciting the employment of himself through persons who are not entitled to practice law and has been paying those persons for this solicitation, and, from all the circumstances, we are convinced that his conduct has extended over a considerable period of time. . . .'' (P. 659.)

When Roth was retained in 1941 to defend Thayne Staker, $1,000 was deposited with him to be used as bail. Roth put up $500 as security for bail and retained the balance. As a result of this transaction, Roth was charged with grand theft and found guilty. He repaid the $1,000, sentence was suspended and he was placed on probation for 10 years.

While this proceeding was pending, the Board of Governors declined to accept Roth's proffered resignation without prejudice. Roth did not appeal from the judgment of conviction and he was disbarred automatically. (Bus. & Prof. Code, § 6102.) Five years later, probation was terminated, the judgment set aside, and the cause dismissed under the provisions of section 1203.4 of the Penal Code.

After disbarment, Roth volunteered for military service but was rejected because of his age. He became a defense worker in a shipyard, studied accounting at night school, and secured a position in the accounting department of an aircraft company.

Soon afterward, he went into the liquor business for himself. He sold that business about seven months later to pur-

chase the first of a series of three bars which he operated during the remainder of his period of probation. Two of these bars were on South Main Street in the "skid row" section of Los Angeles. The third was a de luxe restaurant-night club known as the "Californian" of which he was part owner and operator from 1946 to 1949. For a short time, Roth also engaged in an unprofitable building venture. After he sold his interest in the "Californian," Roth sought employment in the aircraft industry but, because of his age, was unable to find work.

In connection with his various liquor businesses, Roth obtained the requisite licenses after the usual investigation of his character and reputation. No license was revoked, nor was Roth at any time in difficulty with the authorities concerning the manner in which he conducted his premises. His purchases of the various businesses were financed by substantial loans, one in excess of $70,000. Although, to a certain extent secured by the assets of the business including the fixtures, it appears that the larger portion of these loans was based upon personal credit. All such loans were repaid in full, and Roth is not presently in debt.

In his petition for reinstatement, Roth stated his earnings in lump sum figures ranging from about $1,300 in 1943 to $5,200 in 1949, with a loss of approximately $1,600 in 1946. No breakdown indicating the sources of his earnings was given. He also presented copies of his federal income tax returns for the years 1947 to 1949. These show a declared income of $2,100 in 1948 and $4,475 in 1949, rather than the $5,200 reported for each of those years in his petition for reinstatement. At the hearing before the administrative committee, Roth testified that he "earned over $1,000.00 a month" in 1946, but that he had to sell one of his bars at a $13,000 loss. He also stated that, in 1944, he had lost about $7,000 in stock transactions. Apparently he deducted this loss in arriving at a "net income" figure for that year of approximately $1,800.

At the hearings before the local administrative committee, Roth produced 11 witnesses who testified that his moral character and legal ability are good. He also presented eight letters in which the writers expressed confidence in him. The uncontradicted evidence shows that, since his disbarment, Roth has not been in any legal difficulties and has been fair and honest in his dealings with others.

Two officers of the vice squad of the Los Angeles Police Department testified that Roth made every effort to conduct

his bar business in a lawful manner. According to them, his places were considered above average for the neighborhood in which they were located. This opinion of Roth's business dealings was repeated by the probation officer who recommended termination of his probation.

Five of the witnesses knew Roth only casually and based their opinions of him either upon what he had told them himself or upon information supplied by others. None of them had been told of Roth's discipline prior to his disbarment. Roth had misinformed one of them concerning the facts of his conviction. This witness said that Roth's inaccuracy in stating the reason for his disbarment "is inclined to lessen my faith in him slightly." Although he had heard nothing against Roth, the witness said, "Whether he is reformed completely or not, I do not know." Two of the others stated that if they had known of Roth's prior difficulties their opinion of him might have been different.

One witness, the judge who granted Roth probation after his conviction, knew nothing concerning him since that time. He stated that Roth had showed above average ability as a practitioner before his court prior to his disbarment. Two more of the witnesses who testified that Roth was capable as an attorney based their opinion upon the ability which he demonstrated in practice before being disbarred. Three stated that he displayed a present understanding of legal problems.

Only two of the witnesses had more than a casual acquaintance with Roth. One was his brother, the other a former law associate. Basing their opinions upon the manner in which Roth conducted his business operations, both felt that he had rehabilitated himself. Recently, Roth has used his former associate's law library for study.

Seven of the letters introduced into evidence were to the effect that Roth has a reputation for honesty and integrity in his business dealings. The eighth was written by the judge who terminated his probation. Until the motion for dismissal came before him, he knew nothing of Roth's difficulties. In prior professional dealings with Roth, the judge had been impressed with him "as being an honorable man." The judge wrote, "I have every reason to believe that Mr. Roth is worthy of the confidence of the community and that it would be a credit to the Bar to reinstate him."

No evidence was introduced to indicate that Roth has been guilty of any wrongdoing since disbarment. The chief investigator for The State Bar testified that no complaints have been made against Roth since his conviction.

Concerning one of the matters involved in the contempt proceeding and the first disciplinary investigation (*In re Roth, supra*; L. A. No. 798, *supra*), Roth testified that the court directed money recovered for a minor to be placed in the bank and not withdrawn until the boy reached his majority. However, he said, "about six months later or so the boy wanted to buy an automobile, and the parents wanted him to have it and after that they withdrew sufficient money to buy the car. That, in my opinion, was not a violation of the court order."

He discussed the matters which led to his suspension (*Roth v. State Bar, supra*) as follows: "When I came out here, there were open and legal ambulance chasing businesses going on . . . I would pay them a flat fee for this investigation work . . . it was a better deal than some lawyers that were splitting a fee with them . . . I had only been out here for a few years. And then I learned that the Bar Association prohibited the handling of any case that was originally solicited regardless of what agreement the lawyer may have had with the person who solicited it, and I quit handling any cases that were originally solicited at least two years before I was called into the Bar for handling and soliciting cases."

Roth stated to the committee that he had no right to take the money in the case which resulted in his conviction and disbarment. He said that he needed it because of illness in the family and thought he would be able to repay it from the fee which he expected to receive upon completion of the trial. The fee was not paid to him and he could not return the money when it was demanded of him.

In regard to his present legal ability, Roth testified: "I read all of the advance sheets decisions, I have read the codes, I have read all the textbooks and pamphlets that he (Burby) has for law students who are about to take the Bar examination, and I have discussed legal cases and legal problems with lawyers that I know who keep abreast of it." He also stated that he has attended refresher courses on procedure and law lectures, as well as meetings of The State Bar.

The local administrative committee concluded that this evidence was not sufficient to support the burden of proving

rehabilitation and present learning in the law and that Roth lacks the present qualifications for reinstatement. Its unanimous recommendation that the petition be denied was approved by the Board of Governors.

Roth contends that evidence of his past misconduct is irrelevant and does not constitute a ground for denying reinstatement. According to him, the relevant evidence shows without dispute that he has both the moral and mental qualifications to practice law. The State Bar argues that Roth's prior misconduct was properly considered. The position of the Board of Governors is that he failed to meet the burden of proving, by clear and convincing evidence, that he is entitled to reinstatement.

■ There is no merit to Roth's contention that evidence of his past misconduct is inadmissible in this proceeding. The cases upon which he relies for this argument are those which lay down the rule that the petitioner for reinstatement may not attack the proceedings which resulted in his disbarment. (*Maggart* v. *State Bar,* 29 Cal.2d 439, 443 [175 P.2d 505]; *In re Andreani,* 14 Cal.2d 736, 751 [97 P.2d 456]; *Vaughan* v. *State Bar,* 208 Cal. 740, 742 [284 P. 909].)

■ He has the burden of proving rehabilitation by evidence of his present qualifications. (*Maggart* v. *State Bar, supra.*)

■ This court repeatedly has held that "the person seeking reinstatement, after disbarment, should be required to present stronger proof of his present honesty and integrity than one seeking admission for the first time whose character has never been in question. In other words, in an application for reinstatement, although treated by the court as a proceeding for admission, the proof presented must be sufficient to overcome the court's former adverse judgment of applicant's character." (*Kepler* v. *State Bar,* 216 Cal. 52, 55 [13 P.2d 509]; *Feinstein* v. *State Bar,* 39 Cal.2d 541, 546 [248 P.2d 3]; *Beeks* v. *State Bar,* 35 Cal.2d 268, 275 [217 P.2d 409]; *Maggart* v. *State Bar, supra,* p. 444; *McArthur* v. *State Bar,* 28 Cal.2d 779, 788 [172 P.2d 55].) ■ In determining whether that burden has been met, the evidence of present character must, be considered in the light of the moral shortcomings which resulted in the imposition of discipline. (*Feinstein* v. *State Bar, supra,* pp. 560-561 and cases there cited.)

■ Roth argues that he is entitled to reinstatement because the evidence which he produced of his present good

moral character was undisputed. However, the question is not whether any evidence was presented to controvert his showing of present good character, but rather whether his proof is "clear and convincing, nay, . . . overwhelming, proof of reform." (*In re Morganstern,* 85 Cal.App. 113, 117 [259 P. 90]; *Feinstein* v. *State Bar, supra,* p. 561; *Wettlin* v. *State Bar,* 24 Cal.2d 862, 869 [151 P.2d 255].)

■ The very most which can be said for the evidence produced by Roth is that it tends to prove a present good reputation for honesty and integrity in business dealings. There is no convincing or overwhelming proof that he now possesses the highest moral qualities required of an attorney. To the contrary, his own testimony indicates a more than careless attitude toward the rules of conduct of the profession.

In discussing his financial affairs, Roth consistently failed or refused to differentiate between capital and income. In view of the fact that he testified to his qualification as an accountant, it cannot be inferred that his confusion of finances resulted from ignorance. He stated that his statement of earnings in the petition complies with a rule of The State Bar requiring a report of monthly earnings and other income, together with the sources thereof. This was despite the fact that he had presented no statement of monthly earnings and other income and had reduced his report of annual income by capital losses. The failure to report a monthly income in excess of $1,000, earned within five years after his conviction for taking $500 of trust funds for his own use, does not tend to prove that Roth possesses the highest integrity.

The same indifferent attitude toward strict compliance with the law is indicated in Roth's discussion of the contempt proceeding. (*In re Roth, supra;* L. A. No. 798, *supra.*) In that instance, he did not consider the withdrawal of money to purchase an automobile to be a violation of a court order requiring the fund to be held intact. In like manner, Roth's testimony indicates that he feels aggrieved by the action of The State Bar in prosecuting him for "ambulance chasing" when it was being done openly. That he should have been familiar with the professional rules of ethics does not seem to have occurred to him.

The testimony of the witnesses whom Roth produced is far from the clear and convincing "proof which we could with confidence lay before the world in justification of a

judgment again installing him in the profession." (*In re Morganstern, supra.*) Most of them were mere casual acquaintances. One, in fact, knew nothing about his present character. Roth had misinformed one of the witnesses concerning the reason for his disbarment and had informed none of them of the preceding series of transactions for which he had been investigated or disciplined. Several of the witnesses indicated that such knowledge might have altered their opinion of him.

Roth relies upon *Jonesi* v. *State Bar,* 29 Cal.2d 181 [173 P.2d 793], as being similar in facts to the present situation and controlling upon the question of whether he should be readmitted. . However, in the Jonesi case the local administrative committee unanimously recommended the petitioner's readmission and the recommendation was approved by a representative of the local bar association. The Board of Governors, by a vote of nine to three, found that Jonesi was not entitled to reinstatement. It appeared from the record, however, that at least three of the members of the board were influenced by a belief that Jonesi was precluded from reinstatement because he had resigned in accordance with an order terminating his right to apply for readmission. In addition, Jonesi produced recommendations by "members of the bar who had frequent and fairly intimate contact with him." Under those circumstances, the court held that he was entitled to reinstatement.

■ Letters of recommendation and the favorable testimony of witnesses are entitled to considerable weight, but such evidence, however laudatory or great in quantity, is not alone conclusive. (*Feinstein* v. *State Bar, supra,* p. 561.) The committee of The State Bar, which has an opportunity to hear the witnesses and the petitioner, is in a better position than is this court, which has only the printed record upon which to determine the issue of the applicant's rehabilitation. ■ Although this court has plenary power to reinstate an applicant, it has always accorded the greatest deference to the recommendation of The State Bar and its administrative committee. (*In re Lacey,* 11 Cal.2d 699, 701 [81 P.2d 935].) "Only where the record clearly and convincingly demonstrates that the applicant possesses an acceptable appreciation of the duties and responsibilities of an attorney at law in relation to his clients and the courts may a decision overruling the unfavorable action of the Board of Governors

be justified." (*Feinstein* v. *State Bar, supra,* p. 562; *Beeks* v. *State Bar, supra,* p. 277.)

The application of petitioner for reinstatement is denied.

CARTER, J.—I dissent.

"The uncontradicted evidence shows that, since his disbarment, Roth has not been in any legal difficulties and has been fair and honest in his dealings with others." "No evidence was introduced to indicate that Roth has been guilty of any wrongdoing since disbarment. The chief investigator for The State Bar testified that no complaints have been made against Roth since his conviction." These statements from the majority opinion show that only evidence of misconduct prior to disbarment bars petitioner's right to reinstatement.

The above quoted statements also show that a majority of this court has again considered conduct prior to disbarment in determining whether petitioner is *presently* rehabilitated so as to gain readmission to the Bar. It is also said that the evidence he must produce as to his present good moral character must be "clear and convincing, nay, . . . overwhelming, proof of reform." I am still at a loss (see my dissent in *Feinstein* v. *State Bar,* 39 Cal.2d 541, 548 [248 P.2d 3]) to know just *what* is expected of a petitioner in a case such as this in way of the proof he must adduce. If he produced all the people with whom he has done business, or all the acquaintances he has made since his disbarment, the majority would say that none of them had known him before—or that because he had done well in one type of business and gained a reputation for good character and fair and honest business dealings there, he might not have that same reputation in another type of business. It appears to me that no matter what he does, or says, or how many witnesses he produces, The State Bar, aided and abetted by a majority of this Court, will deny him readmission to his chosen profession. If past conduct is to be considered in determining his *present* fitness to practice law, then that is the only result which can be reached because, to my mind, "overwhelming" proof would be proof with no contradictions. If conduct prior to disbarment is not the determinative factor here, then the statements in the majority opinion to the effect that no evidence was produced contrary to the evidence of his good reputation show that petitioner has borne the burden of proof and should be reinstated.

I would grant the application for reinstatement.